**FILED**
U.S. DISTRICT COURT
EASTERN DISTRICT ARKANSAS

JAN 0 6 2025

TAMMY H. DOWNS, CLERK
By:_____
/DEP CLERK

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS

MYRA CHRISTENSEN and            )
REED CHRISTENSEN                )
                               )
v.                             )        Case No. 2:24-cv-229
                               )
FCI FORREST CITY LOW and        )
CHAD GARRETT in his official capacity )
as Warden.                      )
_____)

## COMPLAINT

Plaintiff MYRA CHRISTENSEN and REED CHRISTENSEN, acting pro se, hereby

bring this Amended Complaint against FCI FORREST CITY LOW federal prison and its warden

CHAD GARRETT in his official capacity.

### NATURE OF THE ACTION

1.      This action alleges that REED CHRISTENSEN is being subjected to inhumane

treatment in violation of his civil and human rights while he is incarcerated at Defendant

FCI FORREST CITY LOW under the direction of its warden Defendant CHAD

GARRETT.

2.      Further, REED was sent to the Special Housing Unit (SHU) where he was not

able to contact his wife MYRA CHRISTENSEN. MYRA was led to believe that her

husband had either died or was seriously injured and the Jail was covering it up. The

Defendants knew that MYRA was experiencing foreseeable emotional distress because

she believed that her husband was dead and took no steps to assure her that her suspicions

1

were false. It would have been very simple for the Defendants to allow a short phone call to alleviate MYRA's suffering. But the Jail allowed her to suffer over Christmas until after New Years.

3.      REED begged the Defendants to allow him a short call with his wife so that she can hear his voice and he could tell her he was not dead. But the Jail refused to allow him a phone call, and told him "if you were dead we would call her."

4.      As a result, MYRA had no choice but to file this lawsuit. Subsequent to filing the lawsuit, a phone was brought to REED and he was permitted to call MYRA.

5.      REED is currently in the SHU. He is on a top bunk bed which is an imminent danger as he has experienced multiple strokes and vertigo and is a fall risk. Also, there is no chair in the cell. The only place for him to sit is on the toilet seat. Further, he is suffering from severe chronic diarrhea that the Defendants are fully aware of, but no appointment with a specialist has been scheduled for months. Moreover, he is suffering severe mental illness from his incarceration and he has not received any mental health care in over a year. He has lost over 30 pounds because he is not provided with adequate calories for a man his size and because the food lacks even minimal nutrients.

6.      This lawsuit alleges that the Defendants are illegally punishing REED and subjecting him to inhumane conditions and that the Defendants have caused MYRA emotional distress by leading her to believe that her husband was dead for over a week.

## JURISDICTION AND VENUE

7.      This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331.

2

8.      This action is brought under the authority of *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics*, 403 U.S. 388 (1971), which provides an implied right of action for damages against federal officials who, acting under color of federal authority, violate a plaintiff's constitutional rights.

9.      Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) because the acts complained of occurred in this District.

## PARTIES

10.     Plaintiff REED CHRISTENSEN is an adult who is currently incarcerated in FCI FORREST CITY LOW, a federal prison located in the Eastern District of Arkansas.

11.     Plaintiff MYRA CHRISTENSEN is an adult citizen of the state of Idaho.

12.     Defendant FCI FORREST CITY LOW is a federal prison located in the Eastern District of Arkansas.

13.     Defendant CHAD GARRETT is the warden of FCI FORREST CITY LOW, and is being sued in his official capacity.

## FACTS

### *Reed and Myra Christensen*

14.     Until April 14, 2021, Reed and his wife Myra lived on a farm in rural Oregon. Reed is 66 years old and an honorably discharged army veteran officer who served overseas. He ran for Governor of the State of Oregon, and his name appeared on the GOP primary ballot in May of 2022. He earned a master's degree in electrical engineering and worked as a senior engineer at Intel for over 30 years. He is a pillar of his community and of his church. His wife Myra is a professional cellist and an author of children's books.

3

15.     On January 6, 2021, Reed traveled from his home at the time in rural Oregon to Washington, D.C. to hear President Donald Trump speak and to participate in the Stop the Steal rally. While he was peacefully protesting, he was sprayed multiple times with chemical irritants by Police. After the spraying, in the confusion, he was involved in a short altercation with police that lasted less than one minute. After that, Mr. Reed left the area, and was not accused of storming the Capitol, insurrection, or even entering the Capitol. For this brief altercation, he was relentlessly prosecuted and sentenced by a D.C. judge to 46 months in prison.

16.     On January 14, 2021, before he was arrested, Reed began showing symptoms of a stroke and was admitted to the hospital on January 17, 2021. He remained in the hospital/ rehab facility until his release on February 10, 2021. He then underwent physical therapy and ongoing evaluations for several weeks. As a result of the stroke, he temporarily lost his ability to walk, and thereafter to this day he walks with difficulty. He was prescribed numerous stroke medications that he must take to this day. The stroke permanently damaged half of his cerebellum.

17.     On April 28, 2022, Reed suffered a second stroke. This stroke permanently damaged the other half of his cerebellum, and damaged his medulla as well. The second stroke caused him to withdraw his candidacy for Governor of Oregon, but his name appeared on the ballot in May of 2022, because it was too late to remove it. As a result of the second stroke he was put into intensive care so as to be prepared for life-saving intervention. As a result of the second stroke he experiences constant pain for which he is prescribed pain medications that he must take several times daily.

4

### *Detention in D.C.*

18.    Reed was first arrested on April 25, 2021, while he was recovering from his first stroke. He was released on his own recognizance because the federal judge in Oregon, where Reed lived at the time, found that this senior citizen, stroke survivor, army veteran, and senior engineer, with no criminal history was not a flight risk or a danger to anyone. He remained on pretrial release for almost 2-and-a-half years from his arrest until his trial in September of 2023 without any incidents. Despite all of this, D.C. Judge Royce Lamberth ordered that Reed be taken into custody immediately after his trial, and was not given an opportunity to surrender at some date after his sentencing. The reason given was because he was convicted for a crime on January 6, 2021, and therefore deserves a harsher punishment and treatment than others who committed similar or lesser crimes on other day.

19.    He was held in the D.C. courthouse jail for almost three weeks. During that time he was not provided his stroke medication, his pain medication, or nutritious food. Then he was moved to the D.C. Jail where he remained for the months of October, November, December, and a few days in January.

20.    The D.C. Jail was held in contempt by Judge Royce Lamberth because, upon inspection in November of 2021, the United States Marshals found that the jail did not even meet the minimum standards of confinement and was potentially in violation of the Constitution and federal law. The Marshals requested that the DOJ investigate. At the time, all 400 prisoners were removed from the CDF unit. Since then, no investigation has occurred, and the Government has resumed housing prisoners, including Reed, in the

CDF unit. The horrific allegations made by the marshals against the jail include "large amounts of standing human sewage (urine and feces) in the toilets of multiple occupied cells," evidence of pervasive drug use, observable injuries with no corresponding medical reports, and obstruction of justice by the Jail staff.[1] The DC City Council held an emergency meeting on the matter and confirmed that these allegations are true and have been ongoing for years. As recent as May 16, 2024, the DC Department of Corrections gave a presentation on its plans to improve the conditions, but the plan was met with disapproval, and it was noted that as of June 7, 2024, "seventeen people have died in these facilities in the past seventeen months."[2]

21.    While in the DC Jail Reed lived in deplorable conditions consistent with the findings of the United States Marshals.

22.    Further, a loud high pitch sound was played continuously, night and day, for several weeks.

23.    The DC Jail has a policy whereby January 6 defendants are given automatic "points" as high level offenders that they would not otherwise receive based on similar crimes, age, health, physical condition, educational background, and criminal history.

24.    Further, Reed and other January 6 defendants are categorized as domestic terrorists and are therefore subject to harsher treatment than they otherwise would have been subject to.

---

[1]https://www.washingtonpost.com/context/u-s-marshals-service-nov-1-memo-to-d-c-dept-of-corrections-re-d-c-jail-inspection/1ecd5c89-1655-4e86-9ccc-28f432af78c5/.

[2]https://www.courtexcellence.org/news-items/district-task-force-on-jails-justice-statement-disapproving-of-dcs-proposed-jail-plan.

25.    During Christmas time of December 2023, there was no heat in the Jail, and it was during a cold spell. All of the guards were wearing winter coats, hats, and gloves inside the Jail, and Reed and the other prisoners were not even given extra blankets.

26.    At that time, the allegations against the Jail resurfaced in the public, and after the public cried out to their representatives, within 24 hours the inmates were given extra blankets, and the heat was restored.

27.    Shortly thereafter, in early January of 2024, Reed and others were transferred.

28.    Reed was subjected to cruel and unusual procedures during his transfer including but not limited to unusual and unnecessary restraints.

### Detention in Philadelphia

29.    He was taken to FCI Philadelphia where he was held for three months.

30.    He was not provided any stroke medication or pain medication.

31.    He requested several times to see a doctor but was never provided any form of medical care.

32.    His wife Myra engaged the help of a prisoner advocacy group, which was able to pressure the facility to allow Reed to see a doctor, but within a few days after seeing a doctor, Reed was transferred again, this time to FCI Oklahoma, where he was held for about two weeks.

33.    Around May 1, 2024, he was transferred from FCI Oklahoma to Forrest City FCI where he remains today.

### Detention in FCI Forrest City

34.    For several months he was not provided with all of his medication.

7

35.    Myra has continuously advocated on Reed's behalf and as a result he is currently being provided some but not all of his medications. He is not being provided his pain medication which leaves him in excruciating pain all day.

36.    The food is inadequate and does not provide him with sufficient calories or even minimal nutritional requirements.

37.    Reed can only survive by purchasing the ridiculously overpriced junk food provided in the commissary.

38.    After the Jail found contraband on Reed's unit, the warden punished Reed's entire unit by depriving them of commissary for 60 days, except for hygiene products.

39.    After two weeks, Reed's wife Myra once again complained to the warden and other jail staff.

40.    Shortly thereafter, the unit was permitted $25 dollars for each commissary visit, which occurs about once per month.

41.    This is still insufficient for Reed's survival.

42.    Reed has lost 30 pounds since his incarceration.

43.    He looks emaciated and malnourished.

44.    Since August, he has suffered from continuous diarrhea that occurs ten to twelve times every day. This does not count the times he gets up during the night.

45.    As a result of the diarrhea he gets dehydrated.

46.    He requested an appointment with the medical clinic regarding his diarrhea, but was not able to secure an appointment until October.

8

47.     This is a persistent problem with the prison: inmates request appointments with the clinic but are not scheduled to see a health care provider for weeks or even months.

48.     If an outside specialist is necessary, it can take even longer, if it occurs at all.

49.     The problem with providing seniors in prison with adequate healthcare, leading to premature deaths in prison, is well documented.[3]

50.     In October he was seen for a few minutes and was not given any medical care.

51.     He was told he would be called back to the medical clinic for a stool sample.

52.     For over a month he was not called back for a stool sample.

53.     In November, Myra contacted the office of Idaho Senator Mike Crapo.[4]

54.     Senator Crapo ordered a congressional inquiry about Reed's conditions of confinement.

55.     Within days of the order, Reed was called for a stool sample.

56.     The stool sample did not produce any results that could be diagnosed by the Jail clinic.

57.     The medical clinic suspects that he may have developed colon cancer.

58.     To this day, he is not scheduled for an appointment to examine him for colon cancer and he continues to suffer from diarrhea.

59.     After his second stroke Myra arranged that she has full power of attorney for her husband Reed.

---

[3] *See, e.g., https://eji.org/news/prison-health-care-crisis-mounts-as-incarcerated-population-ages/.*

[4] Myra moved to Idaho in October of 2023 after Reed was incarcerated, and that is where she resides today.

9

60. In June of 2023, Myra hired an attorney to submit a request to the warden for compassionate release.

61. As an inmate with a neurological stroke and a senior citizen, Reed is eligible for compassionate release.

62. The warden received the request certified mail but he did not take any action, either to approve or deny.

63. After Reed began to experience diarrhea in August of 2023, Myra submitted a second request for compassionate release.

64. Myra began contacting the warden via email almost every day inquiring about the compassionate release.

65. The warden claimed he was processing it and sending it to appropriate people, including Reed's case manager, Mr. O'Kane, but Mr. O'Kane told Reed that he had never received anything from the Warden.

66. Myra continued to advocate, but Reed continued to experience serious symptoms and was not receiving appropriate care.

67. Reed was also starving and precipitously losing weight.

68. Myra complained about the lack of adequate nutritious food to no avail.

69. Finally, Myra contacted her Senator Mike Crapo, and either that day, or the very next day after being contacted by the Senator, Reed was called to the medical clinic for a stool sample.

70. When the stool sample was inconclusive, the staff at the medical clinic said that he would need to get tested for colon cancer.

71.    The staff joked that he would not be able to have an appointment with a specialist in Memphis until after January 20, 2025, and he would probably be pardoned by President Trump and sent home before then.

72.    It is well known that President Trump has stated that he will likely pardon January 6 defendants like Reed.

73.    Myra continued to advocate for Reed.

74.    Myra sent her complaints to the regional office and to the director of the Bureau of prisons.

75.    Until December 24, 2024, Reed called Myra almost every day and sent a letter once a week. He also communicates occasionally through the Jail email service with Myra, his son, his brother and others.

76.    Mysteriously, nobody heard from him on Christmas Eve or Christmas.

77.    Myra spoke to him on December 23, 2024, and he was in good spirits. He was excited because he believed that he would be pardoned and released on or shortly after January 20, 2025, when President Trump takes office.

78.    For over a week, Myra persistently demanded from the Warden to know what had become of Reed.

79.    The Warden responded but refused to provide any meaningful information, stating that he cannot tell Myra where he is or why he is missing.

80.    Myra sincerely believed that Reed was being punished because of her complaints to the Senator, and was possibly even dead and the prison was hiding it from her.

11

81.    Myra filed this lawsuit hoping it would force the Jail to provide proof of life, because she sincerely believed that Reed might have died in prison and the Defendants were covering it up.

82.    Myra repeatedly made it known to the Defendants in emails that she believed that there was a coverup and that the Defendants were hiding something.

83.    Finally, after the lawsuit was filed, the Defendants brought a phone to Reed's cell and permitted him to call Myra.

84.    This could easily have been done on December 24, 2024, when Reed first stopped being able to communicate with Myra and it would have avoided severe emotional distress that Myra experienced from not knowing if her husband of 45 years was dead or alive.

85.    For no legitimate reason, the Defendants did allow Reed to contact Myra during that time.

86.    Myra came to learn that Reed was in the SHU because apparently on Christmas Eve, Reed - a 66-year-old engineer with no criminal record malnourished dehydrated severely ill with chronic diarrhea possibly less than 4 weeks from a presidential pardon - tried to scale a 20-foot barbed wire prison fence.

87.    For that, Reed was thrown into the SHU.

88.    To this day, he has not received a hearing of any kind in the prison.

89.    The alleged "escape attempt" was obviously a manifestation of mental illness that Reed is suffering as a combined result of his stroke, chronic pain, chronic diarrhea,

12

dehydration, malnutrition, and other trauma he is suffering from his long incarceration in four different facilities.

90.     The First Step Act requires that Reed be held in a prison that is within 500 miles of his home.

91.     Reed is over 1,600 miles away from his home, in clear violation of the law.

92.     This distance has caused substantial expense and stress for Myra who herself is a senior citizen.

93.     It has also contributed to Reed's mental health deterioration.

94.     The First Step Act requires close proximity to family because of the obvious strain on mental health that is caused as a result of being held so far from home and family.

95.     It also makes it harder for his other relatives to visit as well, thus further contributing to his mental health decline.

96.     The Defendants knew or should have known that Reed was experiencing mental health decline just by looking at him.

97.     He looks emaciated and has lost over 30 pounds.

98.     Any "escape attempt" given the totality of the circumstances is also an obvious sign of mental health decline.

99.     Reed tried to escape on Christmas Eve just a few days after Myra had just visited him.

100.    When Myra finally spoke to Reed she could tell that he was not speaking like himself.

13

101.    He worked for large companies like Intel and Biin for over thirty years as a Senior Engineer heading up some of the largest validation programs. He was able to find major bugs in chips that Intel had already placed on the market but had serious problems, saving Intel millions of dollars.

102.    He is a logical person who has lived a life of good decisions, with no criminal record. He was gainfully employed at a high level. He is an intricate planner professionally and in every aspect of his life.

103.    He is an Eagle Scout and served many years as a Scout Master while his four sons, who all became Eagle Scouts, were in the Scouts. He organized campouts for every month of the year. He was an active member and past leader of his church congregation.

104.    He organized and ran the Washington County Volunteer center to help victims within the county during the largest 500 year flood the state of Oregon had ever seen. This included securing hay to be sent to the famous Tillamook co-op to assist in feeding the many dairies on the Oregon Coast. He worked directly with County officials and fire departments within the county securing equipment and vetting volunteers to help where needed.

105.    He served in the Oregon GOP as a precinct person, captain, and secretary of the Washington County Oregon GOP. He ran for Governor and appeared on the GOP primary ballot in May of 2022.

106.    Any allegation of an "escape attempt" is either false or else is an obvious sign of mental illness that requires immediate attention, not isolation and punishment.

## CAUSES OF ACTION

14

**COUNT I:** *Violation of Eighth Amendment by both Defendants against Reed Christensen*

107. The Defendants are deliberately indifferent to Reed's condition in violation of the Eighth Amendment.

108. Reed has experienced continuous diarrhea since August without adequate treatment.

109. This is a condition so obvious that even a lay person would easily recognize the necessity for a doctor's attention.

110. The Defendants know that Reed suffered two strokes before he arrived at the prisons.

111. The Defendants have been made aware of the medications that he has been prescribed by his physicians.

112. The Defendants refuse to provide him with all of the medications he has been prescribed, including medication for chronic pain.

113. The Supreme Court held that deliberate indifference to serious medical needs of prisoners constitutes cruel and unusual punishment.

114. It is now obvious that Reed's diarrhea is a serious problem that can even lead to his premature death.

115. The Defendants' failure to rush him to an emergency room or to even schedule an immediate appointment with a specialist is not simply negligence or recklessness. It is deliberate indifference.

116. This is especially true since Myra has been persistently bringing this to the attention to the warden and others, including his Senator.

117.    The deliberate indifference is supported by the fact that the prison moved swiftly to schedule an appointment for a stool sample on the day or the day after Senator Crapo became involved. This shows that the prison has the ability to move swiftly when motivated, but chooses not to, out of deliberate indifference.

118.    He also is in desperate need of mental health care which is not being provided to him.

### COUNT II: *Intentional Infliction of Emotional Distress*
### *by both Defendants against Myra and Reed Christensen*

119.    Defendants through their conduct have intentionally caused and are causing Myra and Reed severe emotional distress that could be avoided but for the conduct of the Defendants.

### Count III: *Violation of Fifth Amendment by both Defendants against Reed Christensen.*

120.    Defendants are a federal prison acting under the color of state law and therefore are required to provide Reed with due process before depriving him of a liberty interest.

121.    Reed has been in the SHU as a punishment for almost two weeks and has never received a proper hearing.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that this court:

A. Issue a temporary restraining order and permanent injunction prohibiting the Defendants or their agents from further violating Reed's constitutional rights and ordering that he be immediately placed in a cell whereby he is not on the top bunk of a bunk bed, and where he has a place to sit other than the toilet.

B. Issue a temporary restraining order and permanent injunction ordering the Defendants to provide Reed immediately with all of the medications that he has been prescribed for his stroke, for pain, and for all other medical conditions.

C. Issue a temporary restraining order and permanent injunction ordering the Defendants to provide Reed with a diet that is sufficient in calories and basic nutrition for a man of his age, health, and physical condition.

D. Issue a temporary restraining order and permanent injunction ordering the Defendants to immediately take Reed to an emergency room to be evaluated for his chronic diarrhea, and to schedule an appointment with an appropriate specialist to evaluate the condition.

E. Set an expedited briefing schedule and an in person hearing for full consideration of the above relief sought.

F. Order that any injunction or restraining order issue without bond, or with a nominal bond.

G. Award compensatory damages and court costs, including the cost of travel to file this motion and appear at a hearing.

H. Grant such other relief as the Court deems proper.

Dated: December 30, 2024

Signed: _Myra Christensen_
Myra Christensen

Address: _3929 E 20 N_
_Rigby ID 83442_
Phone: _503-200-4151_

17

Signed: *Reed Christensen*
Reed Christensen
(signed by Myra Christensen as authorized agent)

FCI Forrest City Low
1400 Dale Bumpers Road
Forrest City, AR 72335


## DECLARATIONS OF PLAINTIFFS

I Myra Christensen have hereby attest that the facts contained in the above Complaint are

true and correct to the best of my knowledge and belief.

I further attest that I am authorized by my husband Reed to act on his behalf with respect

to this lawsuit.

Dated: January 6, 2024

Signed: *Myra Christensen*
Myra Christensen


## DEMAND FOR JURY TRIAL

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiffs hereby demand

a trial by jury in this action on all issues triable.

18