**FILED**
**U.S. DISTRICT COURT**
**EASTERN DISTRICT ARKANSAS**    1

MAY 0 2 2025

**TAMMY H. DOWNS, CLERK**
By:_____
**DEP CLERK**

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
600 West Capitol Ave, Suite A149
Little Rock, AR  72201

REED K CHRISTENSEN                                                    PLAINTIFF

v.                                    No:  2:24-cv-00229-DPM-PSH

UNITED STATES DEPARTMENT OF JUSTICE   and
UNITED STATES DISTRICT COURT OF D.C.

                                                              DEFENDANTS

## COMPLAINT

Plaintiff  REED CHRISTENSEN, acting pro se, hereby brings this Amended Complaint against

U.S. DEPARTMENT OF JUSTICE  and U.S. DISTRICT COURT OF D.C.

  I. Nature of the Action ...... …........................... Page 1
 II. Jurisdiction and Venue ................................ Page 2
III. Parties …................................................. Page 3
 IV. Statement of Facts …................................... Page 3
        a)  *Background and Character*  ...................... Page 3
        b)  *Beliefs on Elections* ................................. Page 6
        c)  *Actions on January 6, 2021*  ...................... Page 7
        d)  *Arrest and Pre-trial Period*  ..................... Page 11
        e)  *Run for Oregon Governor*  ...................... Page 13
        f)  *Trial in U.S. District Court D.C.*  .............. Page 14
        g)  *Detention in D.C.*  ................................... Page 21
        h)  *Sentencing in U.S. District Court D.C.*  ... Page 22
        i)  *Detention in Federal Prison*  ..................... Page 23
        j)  *Life After Prison*  ....................................... Page 28

 V. Causes of Action …...................................... Page 29
VI. Prayer for Relief …........…........................... Page 34
       Signature …................................................ Page 35

## I.  Nature of the Action

1. On December 30, 2024, the plaintiff's wife Myra Christensen filed a *pro se* complaint (2:24-cv-

00229) on behalf of herself and her husband Reed Christensen, then an inmate at the Federal

Correctional Institution – Forrest City Low ("FCI Forrest City Low").   The court allowed the complaint to proceed.  The complaint dealt with the conditions under which Reed was being held in the Forrest City Low prison.  The complaint was put on hold when Reed was released from prison on January 20, 2025 due to a pardon by President Trump.

2.      Soon after the pardon, the court on January 31, 2025, issued an order stating that Mr. Christensen would be allowed to file an amended complaint on his own behalf  In reply to that order, Reed and Myra responded to the court that the original complaint would not be pursued and that Reed would file an amended complaint.  This complaint is a *pro se* filing by Reed in fulfillment of that objective.

3.  This complaint tells the behavior of the DOJ of the Executive branch in relation to Reed's actions on January 6th, 2021.  The behavior of the U.S. District Court of D.C. is also told since it is a part of this entire story.  The court is asked to render a Declaratory Judgment about the justice of the government's actions.

## II.  Jurisdiction and Venue

4.      This Court has jurisdiction over the matter of this action pursuant to 28 U.S.C. § 1331 which grants Federal district courts the authority to hear civil cases where the plaintiff's claim is based on the U.S. Constitution.

5.      The venue is properly in this district, pursuant to 28 U.S.C. § 1391 (b), because a substantial part of the events giving rise to the claim occurred in FCI Forrest City Low, Arkansas.

6.      This Federal district court has the authority and jurisdiction to review a challenge to the behavior of the Executive branch of the U.S. Government.  The argument for this authority and jurisdiction is presented in the accompanying brief.

7.  The court is able to rule in this matter since it is not being asked to overturn the sentence of another

court, or to punish anyone by the award of monetary damages. Rather the court is only asked to use the principles of Americans justice and equity to consider the entirety of this case and make a wise and moral judgment.

## III.  Parties

8.      Plaintiff REED CHRISTENSEN is an adult living in the state of Idaho. He participated in the January 6, 2021 'Stop the Steal' rally and was subsequently arrested, prosecuted, and incarcerated in Federal prison. He was pardoned by President Trump on January 20, 2025.

9.      Defendant DOJ is an agency of the Executive branch of the U.S. government.

10.     Defendant U.S. District Court of D.C. is part of the U.S. government.

## IV.  Statement of Facts

### *Background and Character*

11.     A significant portion of rendering a just judgment about the saga I have endured at the hands of the Federal government for my actions at the January 6, 2021 rally/protest, requires having a proper understanding of who I am - my beliefs and motivations, as proven by my actions during my lifetime. Otherwise, how can a proper judgment be made? If a man is killed, the law distinguishes between manslaughter and various degrees of murder depending on motive and intent. Similarly, what judge or jury would convict a man charged with jaywalking if he left the sidewalk mid-block to snatch a child out of the way of an oncoming bus? This section takes a few paragraphs to establish a clear record of who I really am.

12.     I was born to goodly parents, Gary and Lorene Christensen. At the time of my birth the family was living in Texas as my father was in pilot training for the U.S. Air Force. From my earliest memories my father was my hero – handsome, strong, trim, flying jets, and fighting communists in the

Cold War – who could ask for a better hero!  [Exhibit 1]   My first and earliest goal in life was to fly in the Air Force to protect America like my father.  All three boys in the family followed my father's example of serving in the military due to a love of country instilled in us by my father's love, goodness, and honorable life.

13.     My childhood home was not only loving and patriotic, it was a devoutly religious one.  All in the family were active members of The Church of Jesus Christ of Latter-day Saints (LDS).  There never was a time, either as child, youth, or adult, when I did not have faith in God and did not fully participate in Church services and activities - feeling the warmth, sincerity, and love of a devout religious community.  My Church record shows constant activity, with ordinations from Deacon to Elder, leading to serving as a full-time missionary in South Korea from 1977 to 1979.  After our five children were born I was ordained a High Priest at the young age of 29 and subsequently served in Bishoprics and as a Stake (similar to diocese) Clerk.  [Exhibit 2]

14.     I met my wife Myra at a Church dance when we were both 17 years old and seniors in high school.  It is no mystery why I fell in love with her at first sight and why 50 years later we are still married: she is a natural beauty, full of happiness and light, virtuous, and a woman without guile.  Our relationship kicked off immediately, as she also fell in love with me at first sight.  We dated for two years, including our freshman year at college, until I was old enough at age 19 to serve a mission.  I had always wanted to attend the Air Force Academy and had always orientated my high school activities to achieve that goal.  But the President of our Church had asked all young men who were worthy to serve a mission, and at the time the Air Force Academy would not allow a two year break.  That, along with meeting Myra at an early age, changed my plans.  At the age of 21, after being overseas for two years, I got home from my mission on Thursday evening, drove with Myra to the temple on Friday, and on Saturday morning July 14, 1979 our marriage was sealed for time and all eternity.  [Exhibits 3 and 4]

15.     We raised our five children the way we were raised – our home was that of an active LDS

family. Our first four children were boys, and as they reached age eight the Church's program for boys and young men at the time was Scouting. Myra was their Cub Scouting den mother and when they advanced into Boy Scouts, I supported them by being a scoutmaster. For seven years I worked to provide a rich scouting experience for our sons with meaningful weekly troop meetings, monthly campouts, and a yearly Scout camp. Scouting was a big part of my life growing up, myself and my brothers all were Eagle Scouts, so it was natural for me to do Scouting with our sons. All four of our sons attained the highest Scouting rank of Eagle. This is a picture I had taken of all of the men in the family wearing out Scout uniforms with their Eagle rank. [Exhibit 5]

16.     For the years I worked as a scoutmaster, I taught our sons and dozens of other young men the principles of the Scout oath:

> A scout is trustworthy, loyal, helpful, friendly, courteous, kind, obedient, cheerful, thrifty, brave, clean, and reverent.

To me, trying to model these principles was not particularly difficult as I had been raised in a home that lived them. However, I did fail the scouts on at least one occasion. One Friday night on a campout, I was roused from sleep due to some boys being out of their tent and frolicking noisily around the camp site at 2 AM. I was not happy. In my indignation I used the word "hell" outside of a theological context, as in, "What the h--- do you think you're doing!" Our Scout troop was sponsored by our LDS congregation. That next Sunday in church I rose to apologize to the church members for my language and for failing to be a role model for their sons as a scoutmaster. Using the word "hell" two times in a context of anger are the only times in my life I have ever used any type of expletive. I mention this to bring home the point that for my entire life I been dedicated to living in a disciplined and honorable manner.

17.     After Myra and I finished college in 1983, I was commissioned into the U.S. Army as a 2nd Lieutenant. Our first assignment was to Germany, where we lived for four years. At the end of our

time in Germany, all four of our boys had been born. Military life at the time, at least in Germany during the Cold War, was that of constant field exercises and being away from family. I had thought I would have a 20+ year career in the military like my father, but we decided that Army life would require too much sacrifice and place too much stress on our family. After leaving full time Army life I would do four more years of Army Reserve. When we came back to the U.S., I went back to school to obtain a Master's Degree in electrical engineering. During this time our fifth child, a girl, was born. After school we moved to Oregon where I worked at Intel on microprocessor design teams for 30 years.

### *Beliefs on Elections*

18.     With the above personal background it is now possible for one to have a better understanding of my politics. Although I have always been an avid reader of history, my beliefs about politics and governments are not based just on the opinions and thoughts of men. It is guided by my faith in God and His word as found in the canonized scripture of my faith, as the following quotes illustrate. From the Book of Mormon, Ether 2:12,

> Behold, this is a choice land [America] and whatsoever nation shall possess it shall be free from bondage, and from captivity, and from all other nations under heaven, if they will but serve the God of the land, who is Jesus Christ, who had been manifested by the things which we have written.

And in the Doctrine and Covenants, Section 98:4-7,

> And now, verily I say unto you concerning the laws of the land, it is my will that my people should observe all things whatsoever I command them.

> And that law of the land which is constitutional, supporting that principle of freedom in maintaining rights and privileges, belongs to all mankind, and is justifiable before me.

> Therefore, I, the Lord, justify you and your brethren of my church, in befriending that law which is the constitutional law of the land;

> And as pertaining to law of man, whatsoever is more of less that this, cometh of evil.

To me, the Constitution and the founding of the American Republic, is not some fortunate

happenstance or some accidental alignment of political progress.  The Founders were men inspired of

God who were helped and protected by Heaven as they ushered in a new era of freedom.  This freedom

took root not only in America, but influenced all the world's view of what government should be.

### *Actions on January 6, 2021*

19.     During the 2020 election, I was living in the Portland, Oregon area.  I attended the January 6,

2021 'Stop the Steal' rally in Washington DC.  I made one attempt to cross a police line at the bottom of

the Capitol steps.  I was blocked by officers and pushed back after progressing only a few feet.  After

this exchange I left the Capitol area.  These couple of minutes were captured on government video, and

were presented as a defense video at my trial.  [Exhibit 6]

20.     I originally came to the Jan6 rally hoping to be one of a million plus Americans who would

show up and help inspire some backbone into our representatives who were supposed to be stewards of

our Constitution.  By this date it was clear that both our political and judicial class had decided that

they would do nothing about a stolen Federal election.  And it *was* stolen.  I may have been born at

night, but it wasn't *last* night.  According to the non-stolen election narrative, I was supposed to

believe:

> - a 40-year Washington insider who had never expressed an original idea,
>
> - who was already showing signs of geriatric decline,
>
> - who hardly left his basement to campaign,
>
> - who could not draw a crowd as large as a Sunday school class to his few rallies,
>
> - who said on camera not to worry because he had a great fraud apparatus in place,
>
> - in an election system corrupted by use of vote-by-mail pushed due to COVID,
>
> - that Biden beat Trump and won more presidential votes than the populist Obama.

Right.

21.     To this day, I still find it astounding that so many politicians and pundits pompously pontificate on the "crimes" of protesters on Jan6. Yet the horrendous crime of a corrupted and stolen Federal election is met with indifferent silence – no Congressional investigation into *that*. Hundreds of Jan6 protesters rounded up and their lives crushed for *complaining* about election fraud, but has there been a single arrest by the DOJ for *actual* election fraud? Sure, the 2024 election seemed relatively clean, at least for the office of president, but if the corruption is not erradicated why would it not reappear?

22.     To me it seemed obvious that November 3, 2020 would go down in history as the official date of the death of the American Republic. This date may be just as momentous as January 10, 49 BC - the death of the Roman Republic when Caesar crossed the Rubicon. Like Rome, America will continue to exist, but it will not be a republic controlled by the people. And just as the legions of the dictatorial Roman Empire continued to carry their 'SPQR' (The Senate and People of Rome) banners, Americans may continue to shoot off fireworks on the 4th of July, but such celebrations of liberty will be a farce, a comforting delusion embraced by people for whom reality is too unpleasant to face.

23.     After President Trump's speech near the Washington Monument, I moved with the crowd as it headed eastward up the Mall toward the Capitol Building. When I arrived, the bottom of the steps on the west side of the Capitol was packed with people tussling with a police line. Wanting to avoid the noise and pepper spray in the air, I moved to the south side of the steps where things were more quiet. As I approached this area, a couple of things caused me to transition from my original mindset of supporting a "rally," to participating in a "protest" (neither of which I had ever done before).

24.     The first thing was "Keep off the Grass" signs and barriers set up for the protest. It struck me as absurd – a million agitated citizens, seriously concerned about the death of their Republic, come to D.C. and the powers of our government are concerned about the lawn. It seemed to me like a perfect 'elite vs masses' dichotomy from the book *Les Misérables*.

25.    The second thing leading to my rally-to-protest conversion were two of the officers manning the police line at the bottom of the stairs, which was formed by bicycle racks fastened end to end. These two officers looked to be Capitol Hill tour guides. They were a couple of 5'2" young ladies with pony tails wearing blue bomber jackets. Again, I was struck by the glaring dichotomy between the rulers and the ruled. To me, it looked like powerful shadowy cabals could shred our most sacred laws regarding the rule of the people via elections, and our political and judicial classes were totally unconcerned. Yet, they ordered average people to stay off the grass and to keep away from their (the rulers) Capitol building. And while doing this hypocrisy, they expected American patriots to be so obedient and law-abiding that only tour guides were needed to control them[1]. This struck me as the worst condition a nation can be in – a two-tier system with no consequence for unlawful behavior of the powerful, while average people are expected to be obedient to every law and regulation.

26.    These two thoughts turned  me from rally attender into patriot protester. I came to understand why the protesters at the bottom of the steps were tussling with the police to get up the steps of the Capitol. They were intent on sending a message by crossing the police line and waving the American flag on the steps of the Capitol. Most people there on Jan6 were only in rally mode. But those in protest mode had decided that a message needed to be sent to the arrogant ruling class – you mess with our elections, our Constitution, and our Republic, and we will not obey you.

27.    Let me be clear here about what the nature of the disobedience of the majority of the protesters that day. The disobedience was crossing police lines to wave the flag on the Capitol steps. This seems to be pretty tame "law breaking" compared to nationwide election fraud. But though it was pretty tame behavior, the message it sent was definitely received by the Biden administration. It became imperative to them to ensure more Americans did not openly question their legitimacy to govern. Pushing the nonsensical "insurrection" narrative was the charade that they used to flex their police

---

1    At my trial I learned that these two women where Capitol Hill police officers.

power and round up hundreds of patriots as a warning shot to others to stay on the fence.

28.     After making my decision to become a protester, I started pushing and pulling on the bicycle racks that marked the police line in my area south of the stairs.  This was a fruitless activity as the racks were fastened together and held in place by several young officers.  During this time I was hit point blank in the face by a torrent of pepper spray.  The officer who did this was not on the line, but was prowling up and down behind it with his harness supported, high volume, crowd control pepper spray delivery system.  His pepper spray "SuperSoaker" produces a burst of spray ten times greater than a hand-held device. [Exhibit 7]  Although suffering burning and tearing from the affects of the SuperSoaker, when some protesters down the line hooked up a line and pulled the connected bicycle racks out of the way, I tried to make a dash past the police line.  I barely made it a few feet before bumping into officers who blocked my way and pushed me back behind the line.

29.     After this one attempt, I was hurting and disabled enough by the pepper spray that I left the area.  I sat on a pile of cinder blocks near a construction site, and then on the curb of a street as I tried to clean off pepper spray and to recover enough to travel back to the hotel.  Every so often a cheer would rise up as the protesters pushed the police further and further up the Capitol steps.  I felt my individual effort had been worthless, but I also felt privileged to be witnessing an event that seemed to me as significant as the Boston Tea Party. After the tearing and pain subsided, I took the subway back to my hotel.

30.     After returning home I had to stop watching and listening to the media talk about the events of Jan6.  It seemed to me that no one had a correct interpretation of that day.  The leftist media could not stop hyperventilating about an insurrection, and the media on the right condemned it as a riot.  Even today, a common media summary of that day is "the Capitol Hill riot, where five people died." [Exhibit 8]  Not once in the four years since Jan6 have I heard any media put a subject in that passive tense sentence.  The use of passive voice allows the reader's mind to insert his own subject, and most

people will assume the protesters caused the deaths. But if you insert a subject, that sentence would more accurately read, "where the police killed four protesters." Most people know about Ashli Babbitt who was shot, but have never heard of Rosanne Boylan who was beat to death by police[2], and Benjamin Phillips and Kevin Greeson who were men in the 50's who died from trauma after being subjected to flash-bang grenades tossed into the crowd. The fifth person who died was officer Bryan Sicknick who the media reported for months as being killed by a protester wielding a fire extinguisher. The truth finally came out that he died the next day of a stroke.

### *Arrest and Pre-trial Period*

31.    Less than two weeks after returning home to Portland, I too suffered a massive stroke. I spent three weeks in the hospital and ten days at rehabilitation in order to learn to walk again. In the month of February 2021 we started hearing from friends that I was wanted by the FBI. I did not take this too seriously. I had not done anything important, and the FBI by this point had become a discredited agency and I figured that they had also become incompetent. I did not have a social media presence and I was skeptical of their ability to locate me from video captures. It did not even occur to me that people who knew me would turn me in to their tip hotline.

32.    I was arrested on April 25, 2021 as my wife and I drove to church on Sunday afternoon. A line of police and FBI vehicles were parked on a side road waiting for us to pass by. I later learned that they knew by surveillance, including using drones, that I would be in a car headed to church at 1:30 PM on Sunday. (I would love to have been a fly on the wall to hear the safety/danger briefing on that police operation - "subject is known to be unarmed, a pillar of his community, and a follower of the Prince of Peace.")

33.    I spent the night in the county jail, stripped of my clothing in a concrete cell devoid of any

---

2  Later in the J6 Gulag, most of the men I met who were jailed for violence against police were attempting to save Rosanne.

furniture or bedding.  My mug shot at the county jail has a shirt thrown around my neck as I was  naked except for a smock with non-functioning velcro shoulder straps that I was grasping around my waist to use for a skirt.  [Exhibit 9]   The next morning I was taken to the downtown Portland Federal building.  That same day I was granted pre-trial release by a Portland, Oregon Federal judge.  For the next two plus years, I and my lawyer had regular Zoom conferences with D.C. based judges.

34.     The affects of my arrest, and the dissemination of an FBI Wanted video and a Most Wanted List naming me, were devastating to my family.  Several of our children cut off ties with me to protect their children from a man who the Federal government had identified as dangerous and radical enough to be hunted by a national police force.  This separation removed ten out of sixteen grandchildren from contact with their grandparents.  The affect of this family breakup was especially destructive on my wife Myra. She often was reduced to uncontrollable sobbing and panic attacks, many times to the point where she had trouble breathing.  For many weeks the only way she could be calmed down enough to sleep was by her and me singing together bright and hopeful church hymns at bedtime.

35.     I wrote a book called "Save the Kid!" which covers this period of time.  [Exhibit 10]  (The "kid" that needs saving is America.)

36.     During the first pre-trial hearing, after I had been granted pre-trial release, the prosecuting DOJ attorneys asked the judge to order me to D.C. to have a mental health examination and, if so ordered, to be committed to a mental facility.  Their "evidence" for making such an astounding and severe charge against a man who was fully functional in society, as evidenced by:

   being happily married for 42 years (at that time),

   raising five children in the family, all of whom were wonderful adults, married and raising their
   own children,

   being active in his church community,

   serving in the executive committee of his county political party,

maintaining a 16 acre rural farm property,

while working full time in one of the most advanced technical jobs in the country, was that when I was arrested, my wife had been agitated about me getting my medications. This was "proof" that I was mentally unstable. Yet, the DOJ knew that I had just suffered a severe stroke and that my medications were related to that. When the FBI was searching our home, Myra insisted they deliver my medications to the jail, and they made out a receipt for the pills they took. [Exhibit 11]

37.     My lawyer pointed out to the judge I had suffered a massive stroke just a few months previously, and that was the purpose of the medications. The prosecution backed off. Frankly, I was a bit surprised they did not try to use the old foolproof Soviet indictment, "He opposed the government, so he must be crazy."

### *Run for Oregon Governor*

38.     On the first anniversary of Jan6, I decided to throw my hat in the ring for the Republican primary for Oregon governor. I had been active in my local county politics and had some experience sharing my Jan6 experience with Republican groups around the state. There were at least four other candidates that could be classified as good "MAGA" candidates. But the main reason I decided to run is that none of them were addressing the elephant in the room, namely, that the state of Oregon had vote-by-mail for 30 years. If there was one thing any sentient person should have learned from the 2020 presidential election, it was that vote-by-mail is ripe for fraud. While on the road during the campaign I made a short video discussing what could be done in the face of this disastrous potential for corruption of the state's elections. [Exhibit 12]

39.     For several months my wife and I traveled around the state attending Republican county governor forums, participating with the many other primary contenders in debates. During one of the weeks in May when we were not on the road I suffered a second stroke. I had almost completely

recovered from the first stroke, but this stroke hit me differently. It was not just a matter of impeded walking or lost function of a limb. It left me with constant severe pain and torpedoed my strength and stamina. I did a press release withdrawing from the race, but I appeared on the ballot because it was too late to remove my name. (I received around the same number of votes as the other MAGA candidates.)

### *Trial in U.S. District Court D.C.*

40.     In September 2023, I flew to Washington D.C. for my long awaited jury trial. This was my first experience with the American legal system, other than 15 minutes arguing in traffic court about a traffic ticket I felt was unjust. Myra and I agreed that she should not attend. She was sure she would have a mental and physical breakdown if she were to see her beloved husband and best friend for 46 years attacked and berated in a courtroom. Fortunately I was not alone, my brother Brett came to D.C. and spent the week with me, providing moral and logistical support.

41.     The first two days of the trial were spent trying to seat a jury. This was tedious process because so many of them required "rehabilitation" by the judge. Washington D.C. is a company town of people who work for the Federal government and there was a tedious lack of diversity among the jury pool. All but a handful were government workers, lived on Capitol Hill, and said they had been directly affected by the Jan6 protest. The exact percentage of government workers cannot be known exactly since the jury questionnaire results are not preserved in the court record. However, from what can be gleaned from the court transcript, it can be shown that six government workers ended up on the jury. [Exhibit 13]

42.     Furthermore, of the 43 jurors who came to the stand for follow-up questions, 20 of them had answered on the jury questionnaire that they could not be impartial toward a Trump supporter. [Exhibit 14] The judge spent a lot of time giving lectures to potential jurors about how I was innocent until

proven guilty. Right. Just like in the western where the judge starts the trial by calling out to the sheriff, "Bring in the guilty bum." Despite my lawyer's best efforts, five of these admittedly biased jurors ended up on my jury.

43.     There was one potential juror who was not an ideological clone, who had answered in the negative on the question about his opinion of the FBI. When the judge asked why, the man started listing off news stories of FBI scandals and cover-ups. The prosecution did not even have to use one of their six "strikes" on this man. The judge, without even a request by the prosecution, struck him from consideration as being too biased. [Exhibit 15]

44.     When the trial finally started on the third day, I was absolutely astounded at the first words coming from the mouth of one of the prosecutors (I had three: two active, and one coach). I had no idea that in the American legal system a prosecutor was allowed to spew forth bald-faced lies. Especially a Federal prosecutor or assistant U.S. Attorney (AUSA) who was representing the majesty and integrity of the mighty U.S. government. The prosecutor used a quote from my book, entered as trial exhibit 1, to inform the jury that I had come to Washington D.C. not just to rally, but to protest and cause trouble. [Exhibit 16]

45.     I believe this narrative was pushed at the very beginning of their case in order to establish that I was a member of the "insurrection." Otherwise my benign actions of that day, compared to the millions of dollars spent and three years of prosecution by the DOJ might appear a tad overblown. There is just one problem with this quote. It is proceeded in the book by a couple of pages explaining how protests have been a tool of the *left*, the book explaining why *they* cause trouble at protests. [Exhibit 17] I have seen this protest behavior from the left for my entire lifetime. So unless you believe an AUSA has a reading comprehension less than a third-grader, this was a deliberate lie. It would not be the prosecution's last.

46.     My judge spent a lot of time reading noble words about justice, but his true attitude toward Jan6

defenders came through in one memorable exchange. As I have said, this was my first jury trial experience, other than Perry Mason shows, but this struck me at the time as bizarre. A police officer was being examined by the prosecution and was asked if he perceived a unified goal or intent in the crowd. The officer indicated that they wanted to move forward (closer to the Capitol). Suddenly, the judge interrupted, in a voice of correction, asking, "The goal was to get into the building wasn't it or not?" The officer seemed embarrassed as he pointed out that did not perceive that at the time because he had not been told yet about the "insurrection." The judge continued to question the officer about his statement that the protesters just wanted to get past the police line. [Exhibit 18]

47.     A very large part of the trial was spent by the prosecution proving the three charges of felony assault against me by examining police officers who did not remember me. The three charges were under 18 U.S.C. § 111a "impeding, resisting, or assaulting an officer" and each charge carries a maximum penalty of eight years. The AUSA examination was done by laboriously playing short 2-3 second video clips, showing still capture pictures, asking the officer what he just saw, and leading the officer along until he finally testified that I *impeded* his work.

48.     Here is a summary of what the officers said about my interactions with them:

Officer One: [Exhibit 19]

| | |
|---|---|
| - "I was kind of rushed at by an individual" | Sep 14, p20, line 16 |
| - "a gloved hand grabbing onto my right arm" | Sep 14, p21 line 23 |
| - "he kind of like reached for me … grabbed my body" | Sep 14 p22 line 17 |
| - "*it prevented me from doing the job*" | Sep 14, p23, line 17 |

Officer Two: [Exhibit 20]

| | |
|---|---|
| - "do you recall the contact … No" | Sep 14, p63, line 6 |
| - "I don't recall the particular shoving" | Sep 14, p68, line 4 |
| - "*this individual … is … getting in my way*" | Sep 14, p68, line 10 |

Officer Three: [Exhibit 21]

| | |
|---|---|
| - "they were wanting to get past us" | Sep 14, p76, line 1 |
| - "[Reed] appears to be trying to get past me" | Sep 14, p80, line 11 |
| - "he puts his hands on me" | Sep 14, p81, line 4 |

- "he went towards the officer and is pushing against him" Sep 14, p83, line 7
- *"Did the interaction occupy you?  Yes"*        Sep 14, p81, line 0

The witness quotes above are representational summary, not cherry picked in isolation – as can be seen by reading the entire witness testimonies.  Even after being "reminded" by the prosecution, no officer ever used words such as "assault, struck, or attack" to describe my actions.  Only one time did an officer use the word "hit," while saying "trying to hit" but he immediately backtracked to "trying to touch."  [Exhibit 21.1]    The best (worst?) the prosecution could do was to get the officers to declare that I had *impeded* them from doing their jobs. These are the italicized quotes in the lists above.

49.    There were times when the prosecutor tried to lead the officers toward declaring a physical assault by saying what was *about* to occur or to conjecture about what I *could* do:

Prosecutor:  [Exhibit 22]
- "where he could swing a strike at you"        Sep 14, page 87, line 9
- "he would fight if need be"        Sep 14, page 91, line 11

50.    But even without any testimony of assault from an officer, that word *impede*, coming from an officer of the law is a clear and direct statement that this serious 18 U.S.C. 111a felony law was violated.  This law says you are guilty if you "impede, resist, or assault" a  Federal officer.  As an engineer who spent 30 years working on logic circuits, my favorite quote is from Officer One who said he was impeded because the time he spent controlling me, a member of the crowd, prevented him from doing his job of controlling the crowd.

51.    During the trial I did not get on the witness stand to testify.  My lawyer advised against it.  Even though I had nothing to hide and I think I would have come across as an honorable and reliable witness, I had one big problem – I had gaps in my memory.  After I arrived home from Jan6, the last thing I remembered was holding onto the bicycle rack and being hit in the face by a deluge of pepper spray from the SuperSoaker.  I had no recollection of trying to breach the police line and being shoved back by the officers until I saw the video clips.  Thus, I was quite pleased when the prosecution entered as an

exhibit a portion of an interview that I gave in spring 2021. [Exhibit 23] It was one of my best interviews, and I was happy to have some of my own words presented at the trial.

52.    But the prosecution did not play that clip to show the jury that I was a reasonable and articulate person. The prosecution was setting up a couple of carefully crafted lies in order to denigrate my character and to paint me as a liar. Both of these lies were executed during the testimony of my FBI case agent. Yes, little old me, who had nary a traffic ticket on his legal record and who had never so much as littered, had my own FBI agent assigned during the three years the Federal government prosecuted me.

53.    The first FBI-and-prosecutor lie was about my arrest warrant. In that interview clip I told an incredible story from my arrest. While I was behind the car being handcuffed, my wife was contending with several FBI officers and demanding to see an arrest warrant. At first the FBI agents refused, saying that they did not have to show one. (They said the same thing about not needing a warrant when they came with her to search the house.) But finally one of the female FBI agents came with a stack of papers and showed the arrest warrant. My wife was astounded to see several counts of "walking on the grass." She made a statement like, "You have come all the way across the country to arrest my husband for *walking on the grass*!" The female FBI agent was too embarrassed to come up with a reply.

54.    With the FBI agent on the stand, the prosecution asked him if there were any inconsistencies in my interview. The agent solemnly intoned, "that he was charged with walking on the grass was one." [Exhibit 24] By this time I had been through the legal system enough to catch that this was a carefully crafted deception. Notice that the agent used the verb *charged*. My story was about an *arrest warrant*, which enables the apprehension of the suspect but does not initiate the criminal prosecution. The formal charge comes later, typically when the suspect is brought before a court for an arraignment or

preliminary hearing.  A layman sitting on a jury would not notice that subtle misdirection[3].  So the prosecution was able to use a [sarc] reputable and honorable [\sarc] FBI agent to testify that I was a liar.

55.    There was another FBI-and-prosecutor lie setup from something I said in the interview clip.  In the interview I told about the surreal experience of friends telling me that I was shown on an FBI Top Ten most wanted poster.  The prosecutor asked the FBI agent, "Was Mr. Christensen ever placed on the FBI top 10 most wanted list?"  The agent answered, "No."  [Exhibit 25]  Again, this question was too subtle for this not to have been a purposeful deception.  Note the careful wording so that the question is asking about a very specific list, "*the* FBI top 10 most wanted list."  I never looked at FBI wanted posters and it was other people who told me I was on a "Top Ten" list.  But even if I wasn't numbered one through ten, I was indeed on an FBI wanted poster for *Jan6 protesters*.  [Exhibit 26]   In my interview statement I may have talked about an FBI Top Ten list, but any thinking adult would know I was talking about a wanted list for Jan6 protesters, not referring to the list of murderers and thugs on the Post Office bulletin board.  Again the honorable AUSA officer of the court and the FBI agent carefully worked together to craft a lie to promote the cause of justice [sarc].

56.    As I think about my trial, I have sometimes wondered why my lawyer did not challenge patently false witness statements, like when the FBI agent said that I "participated in yelling, shouting, and taunting officers."  [Exhibit 27]  One can watch on video my entire sojourn at the police line in a couple of minutes and see I did no such thing.  Why did not my lawyer cross-examine and demand some proof of a statement like that?  But as I thought about this I realized the problem.  Officers are sworn agents of the law.  Their testimony *is* proof, and juries tend to believe them over a normal citizen.  That is why the American legal system asks officers to uphold legal, ethical, and professional standards, and why it is so terrible when they do not.

        Note: I have used submitted a couple of Freedom of Information Act (FOIA) requests to the

---

3    The warrant currently on the case docket does not mention "walking on the grass."  Yet, the subtle misdirection crafted by using the verb "charged" suggests that the original did.  (Not to mention the word of my godly and honest wife.)

FBI for any documents they have related to me.  [Exhibit 28]  (I was hoping to get an original arrest warrant, and their BOLO[4] Jan6 wanted poster of me.)  So far no response.

57.    During the trial I was charged with the crime of disrupting interstate commerce.  A document was produced declaring that the local Safeway on Capitol Hill had its business affected.  Yes, the Safeway had lost a million dollars in business the week of the Jan6 protest, and it was my fault. Somehow staying at a hotel for one night, and riding the subway to and from the Mall caused shoppers to stay away.  (It certainly could not have been due to the government throwing up barriers and fences for weeks after the protest as they performed insurrection theater.)

58.    Another ridiculous charge was that  I was found guilt of scaring Vice-President Mike Pence.  A Secret Service agent testified that during the protest they had to whisk VP Pence away for his safety. As my lawyer pointed out, I was not within half a mile of VP Pence.

59.    I have testimony to give that relates to the topic of safety of officials during the protest.  It not only shows the ludicrous nature of this VP Pence charge, but it disproves the entire narrative of the insurrection.  The vice-president being hustled out of the building, and Congress people running out the back door in fear of their lives was nothing but insurrection theater.  The protesters that day were middle-class, Constitution-loving patriots, who were not there to hurt anyone - they were there to protest a stolen election.  Any politician, from either side, could have come out and talked to the crowd and the most they would have gotten was to be booed and jeered.  For evidence of this, during the time when I was sitting down trying to recover from the affects of pepper spray, while the crowd was pushing its way up the Capitol stairs, individuals and small groups of officers were going and coming without concern among the masses of people.  They obviously had no concern about *their* safety.  I would ask you to compare and contrast that to a protest by Anit-Fa in Portland, Oregon.  No officer, in fear of his life, would dare to venture alone into that crowd of protesters.

_____

4   BOLO – be on the lookout for

60.    This VP charge, the Safeway charge, and the constant prosecution descriptions of the "weapons, chaos, obscenities" of that day were all part of the insurrection narrative. It was a while into the trial before I understood what the prosecutor was talking about in her opening statement when she described protesters being "armed with weapons." [Exhibit 29.1]   No Jan6 protester was ever convicted of any violation of D.C. gun law and video of the day confirms there was no brandishing of guns.   An officer even testified at my trial that he never saw weapons in the hands of protesters.  [Exhibit 29.2]  I finally figure out that the "weapons" the prosecution was referencing were flag poles - most of which were American flags.

61.    On  Monday morning September 18, 2023, the jury came in and announced me guilty on all counts.  One of the prosecutors jumped up to remind the judge that vicious felons such as myself (who spent less than two minutes bumping into police officers at a protest) were too dangerous to be let on the streets.  The judge thanked the prosecutor for reminding him of his sacred duty to protect society by keeping a felony impeder (one who impedes) off the streets and he remanded me immediately to jail.

### *Detention in D.C.*

62.    Two Federal marshals took me out the backdoor of the courtroom and down to the warren of holding cells in the basement.  My suit coat and tie were thrown on a table, I was strip searched, shackled hand and foot, and trundled off to the D.C. Department of Corrections jail.  I was placed with another Jan6-er in a cell in the in-processing unit.  Within a few days at the jail I had begun to think I would not survive my incarceration.  This unit was a living nightmare.  We were on 23x7 lock down – locked in a small cell except for one hour a day.  You had one hour when you could exit your cell to do anything useful, such as to wait in line for the phone and take a shower.

63.    The din was extraordinary all hours of the day and night, as most prisoners were held one to a cell, and the men yelled through the food-slot in the doors in order to communicate with other prisoners

in the unit. The bunks were sheet metal and the first night I had nothing but a thin blanket to sleep on and to cover me. The next day we received a worn two-inch thick mattress, but no pillow.

64.    As a 65 year old man who had constant limb pain after suffering two strokes, I soon felt that the sleep depredation was causing my health to crash. I had headaches, felt groggy, and struggled to recall common words. Both my cellmate and I had heard about terrible conditions in the Jan6 cell-block, but we figured it could not be worse than this. No one would give us a definitive answer as to when we get out of this unit and be transferred to the cell-block reserved for Jan6 protesters (i.e. the J6 Gulag). So in desperation, after ten days in the intake unit, we both went on a hunger strike until we were moved.

65.    The next day we were transferred to the J6 unit. The J6 Gulag was a welcome relief. The early terrible conditions of the D.C. jail had been exposed by political supporters of the J6 prisoners, and the jail had been shaped up and several officers fired by the time I arrived. The J6 cell-block was marked for "special handling" so we were banned from the barber shop, library, and chapel. But I never felt that I was subject to any cruel and unusual conditions during my stay there.

### Sentencing in U.S. District Court D.C.

66.    After four months in the D.C. Jan6 Gulag, on January 12, 2024, I was  shackled and taken in my orange convict clothing for my sentencing hearing at the court house. During my four months in the D.C. jail my "impedes" had become "assaults" and the prosecution used the assault word 26 times as they asked for the judge to throw the book at me. [Exhibit 30] They were asking for a 60 month (5 year) sentence. My lawyer got up and gave some indication of my background and character to show why I deserved leniency.

67.    During the listing of my dastardly crimes and my unrepentant nature, one of the prosecutors took a quote from something I said to a parole officer who wrote my Pre-sentencing Report (PSR). At the end of the interview, the parole officer asked if I had anything else to say. A bit lightheartedly, I

gave the famous quote from the Revolutionary War martyr Nathan Hale. I replied, "My only regret is I have but one life to give for my country." The prosecutor recited this quote to the judge as evidence that I was an unrepentant insurrectionist. [Exhibit 31]

68.     My lawyer told the judge of my two strokes. The judge asked no follow-on questions about how the strokes affected my health as a 65 year old senior citizen. [Exhibit 32]

69.     My lawyer also spent some time making sure that the court knew that in no way was my book helping me to profit off my Jan6 notoriety. In fact, in the two years before my trial the book made $50, and the months I was in the D.C. jail it made $800. [Exhibit 33] Considering that my Jan6 legals costs were over $360,000 this was not exactly a positive return on investment.

70.     As the judge got ready to announce my sentence, he said, "this court [has] to deter anything like that day from ever happening again." [Exhibit 34]

71.     I was sentenced to 4 years incarceration, 3 years probation, and a $22,260 penalty.

### *Detention in Federal Prison*

72.     Just days after my sentencing I was told of my transfer to the Federal prison system. On the day before my transfer I completely abstained from food and water since I had been warned that the Bureau of Prisons (BOP) does not believe in bathroom stops during transportation. I was quite worried about this since as an older man with a swollen prostrate I had to urinate more often than a young man. During our day long bus ride to the Philadelphia Federal Detention Center (FDC) and stops en route, I got to see how this had been good advice. Fortunately, I had no problem during the ten hours or so on the bus, but a young man who pleaded with the guards that his medicine gave him loose bowels had no such luck.

73.     My stay in Philly FDC which was supposed to be a few weeks, stretched into a few months. The Philly FDC is a "medium" security level facility, which means it includes all Federal prisoners who are

not considered the most dangerous, who are at the high or penitentiary level. I was blessed not to have any dangerous incidents, the closest thing being a robbery when a man came in to my cell demanding commissary food in the name of his gang. There was no repeat however, as the same day a guard caught the man with a concealed knife and he was taken to the punishment cell block.

74.     Receiving my stroke medication and pain medication was a hit and miss activity in Philly FDC. Upon my reception processing I was informed that Gabopentin, a common pain medication for nerve damage that I had been using for a couple of years, was not handled by the BOP. The way that my new pain medication was dispensed was that a nurse would bring a cart to the unit sometime in the afternoon. The theory was that an announcement would be made, usually by the nurse yelling "Pill Call!" But the prison block was a noisy place and not every nurse knew how to yell over it. Many times I would sit outside my cell in the common area in the afternoon listening, but I would still miss the nurse.

75.     On the day of my transfer to my final designated prison in Arkansas, over 100 prisoners were crowded into a large holding cell. I knew it would take hours for each prisoner to be called out and shackled for the trip, so I was quite pleased when I was the very first name called. My pleasure was short lived when I got to the shackling station. Of the hundred plus men who would be shackled that morning, there were only four "boxes" set aside to be used, and I was one of the four, thus the reason for me being called early.

76.     A "box" is a torture device used by the BOP – it has no other purpose. When traveling, a prisoner is put in leg-cuffs and handcuffs, and a chain that goes around the waist. The waist chain is then pulled snug and passed through the handcuffs, which keeps the hands tight against the torso. The "box" is used by being placed over the handcuffs which holds the handcuffs straight which in turns forces the arms to be parallel. The torture occurs when the box-handcuff combo is pulled toward the torso to be fastened to the waist chain. Pulling the cuffed wrists toward the body would naturally cause

the elbows to splay out, but the box is holding the arms parallel. The end result is a terrible gouging and digging of the cuffs into the wrists. During my final day of transfer to Arkansas I spent six hours in the "box." After I arrived it took a week before the bruises and gouges in my wrists went away.

77.     I arrived at the Forrest City, Arkansas Low prison in early May 2025. Even though I had low enough points to be eligible for a camp (due to my clean record and life background - my recidivism score was actually negative), the Jan6 prisoners were marked for "special" handling so I was assigned to a Low security facility. The Low prison had a campus layout and prisoners had the freedom to move around the campus during the day. The hardest part of this campus layout for me was the half-mile round trip to and from the chow hall three times per day. My second stroke had left a lot of pain in my legs so that walking or standing for anything length of time caused severe pain. After I was able to buy food on the commissary I bought cold cereal and powered milk so I could have breakfast in the cell block and avoid that walk in the morning.

78.     I had a number of medical challenges in prison. The first was losing the big toenail on my left foot due to the camp-issued heavy boots which were the only shoes I could wear until I was able to buy sneakers on the commissary. Because of the stroke after affects in my left leg, I did not feel the pain as the too short left boot tore off the toenail on by big toe. After being rejected at a couple morning sick calls (at 7am, Mon-Fri), I had the idea of wearing a shower shoe on my left foot. After being rejected the third time by the screening nurse, I held up my left foot to show the pussy mess of the nail-less big toe and I was finally granted permission to see a nurse.

79.     Pain medication was also a problem in Forrest City. Again, in order to have a strong pain medication, I could not keep it myself, I had to go to "pill call" everyday at 2pm. This entailed standing in line usually for an hour. This meant that in order to get a pain pill, I had to be in excruciating pain for an hour. After a few weeks of this I gave up, deciding it was not worth it. After some time, I was able to get an appointment in order to ask for a pain medicine that I could keep in a

pill bottle in my locker.

80.    Another health problem I had was five months of diarrhea.  Up to ten times a day I would have

loose bowels.  The prison issued each prisoner four rolls of toilet paper per week.  In a typical two

week period I would go through twelve rolls of toilet paper.  Fortunately, there were young men who

did not use all their allotment who were willing to help me out with extra rolls.  I made several sick call

trips, and my wife worked to initiate a Congressional Inquiry by our Senator, but the problem was

never figured out.  I believe the prison medical staff did their best, but they were really just a clinic

designed to help young men who occasionally got hurt.  The problem was that the prison was chocked

full of old men (60s, 70s) who had chronic health problems which were exacerbated by the harsh prison

living conditions.  When I first arrived at the prison I was astounded by the number of wheelchairs,

walkers, and canes being used by old men getting to chow.  One man in his 70s not only used a walker,

but was blind, his walker was led by another prisoner.  I still had the diarrhea when I was pardoned by

President Trump.   Two days later, after being home and having home cooked food, the chronic

diarrhea stopped.

81.    Another condition that bears mentioning about the Forrest City prison is that I was always

hungry.  In order for me not to lose weight I could not depend just on the food provided by the chow

hall.  In order to maintain my weight it required me to buy about $150 per month of  extra food at the

commissary.   I only had one meal the eight months I was in Forrest City when I left the table full, that

was the 4th of July holiday meal.  Many of the meals were woefully short of calories, and this was for

an old guy with a metabolism much lower than the young men.  Even with purchasing commissary

food to add another meal per day, my weight loss was severe enough while I was in Federal custody

that it shocked my wife when she saw me change out of my prison clothes after my pardon.  She

described my appearance to being similar to "concentration camp" prisoners and insisted on taking a

photo.  [Exhibit 36]

82.     While I was in the D.C. jail, I had been told that the Federal system was so much better when it came to food. They had all-you-can-eat salad and pasta bars, grilled food for breakfast, etc. None of this was true at Forrest City. The inmates who had been there a while said all that stopped with COVID and had never been started up again. I believe another reason for lack of food was corruption. During Thanksgiving 2024 a man in my cell block who worked in the chow hall cleanup crew told me that he had seen 35 cases of pies in the kitchen. No pie was served for Thanksgiving in the chow hall. Nor did any pie show up for sale in the black market in the cell block. Prisoners would steal and sell a lot of food, some of which hardly ever made it to the dinner plates in the chow hall – things like ground beef, cheese, and eggs. But prisoner theft did not account for the pies as they never showed up for sale.

83.     I never encountered any conditions where I felt threatened or unsafe while in Forrest City prison. There were a few "beat downs" in my cell block, but I was not around when they happened. They were always over contraband, such as tobacco, drugs, and cell-phones. Since I was not around these items I was never around any violence. I had a young man tell me that it was easier for him to get off drugs when he was outside than when in prison. If he was outside he could go to his mother's house for a drug-free environment. He said that in prison every and any type of drug was available.

84.     While in Forrest City I worked at the Education Center as a GED tutor. When I started I tried working a full day, but I soon realized that my second stroke left me too weak and that was too difficult a schedule. I should note that my pay was 40 cents per hour, but it was cut to 12 cents per hour when the Education Center decided they need to cut inmate employee expenses. This is the same pay scale for the inmates who worked in the prison factory making furniture for the Federal government. (BOP to the CCP and its slave labor industries - "hold my beer.") The items that an inmate can buy in the commissary were not reduced in price. The prices there are comparable to a corner market or service station market.

85.     One frustration with the Education Center was that they had a Computer Classroom that had

many stations with new computer hardware, but which was never used. I offered my services, pointing out that I had worked in the computer industry for 30 years and that I would be happy to setup any number of useful classes on computer topics. I was given a number of excuses why that would not happen, but the most common excuse was that a couple of years ago someone did something bad in there so the inmates were being punished.

86.    Myra made regular visits to come and visit me in Forrest City Low, coming all the way from Idaho. [Exhibit 37]  Twice she drove our RV the 1,627 miles so that she could afford to stay longer and visit on multiple consecutive weekends. The longest stay she had planned was to stay in Arkansas at a private campsite close to the prison the entire month of October 2024. She was already on the road for this long stay when the warden announced that the Visitation Room would be closed for two weeks. The reason given for the closure was that drugs had been found in the room – so therefore the entire prison would be punished. This closure meant that Myra was forced to sit idly for two weeks in the campsite, as well as having our visit time cut into.

87.    On December 24, 2024 I was transferred to the prison's punishment block (Special Handling Unit – SHU) for trying to climb the fence and take an unauthorized two-day furlough for Christmas. This transfer cut off all communication with my wife Myra. I had been calling her everyday but that was cut off with no notification when I sent to the SHU.  Myra had grave concerns about my health as I was 66 years old and had previously suffered two strokes. She feared the worse due to the sudden loss of communication. She severely distrusted the words of prison officials due to previous encounters. It was during this time that she came to Arkansas and filed the original motion 2:24-cv-00229 with this Court.

### Life After Prison

88.    During the years of DOJ persecution, Reed and Myra have incurred numerous damages:

imprisonment (with attending hunger, weight loss, and chronic diarrhea), separation, loneliness, stress, family division, loss of employment, loss of their dream property, and $366,00 in legal fees. [Exhibit 38 and 39]

89.     Even after his pardon, punishment continues to plague Reed. His brokerage and IRA accounts held by Fidelity and Charles Schwab were de-banked while he was in prison. Specifically, although the accounts still exist, he can no longer participate in the market since he is blocked from buying securities. He is currently stymied in his effort to transfer the accounts. He has been rejected by two other brokerage firms and is still working to regain to gain access to the markets.

        (Note: Fidelity sent an internal account message on April 23, 2025 removing restrictions.)

90.     At this point, after Reed and Myra have reassembled some of the broken pieces of their lives, the plaintiff is not seeking monetary damages. Reed and Myra know how to live with the new reality of a limited income - they married young, went to four years of college together, and started their family while living on the income of their part-time work.   The main loss they feel now is the loss of companionship of the children and grandchildren who were estranged when he was arrested by the FBI.


## V. Causes of Action

**COUNT I:** *Violation of 1ˢᵗ Amendment by the DOJ against Reed Christensen*
**\*\* The DOJ targeted Reed to suppress dissent rather than enforce a neutral law.  \*\***

91.     Reed's actions on Jan6 were minor, he made one attempt to cross a police line. The prosecution knew his actions were benign, at most misdemeanor level, and did not consist of any real assault. This is why during examination the prosecution only attempted to show that Reed "impeded" the officers. So why did the prosecution chose to make three serious felony charges, each with an eight year sentence?  There is no reason under justice or equity for this to be done.  Nor can the case be made that this was a case of "throwing the book" at a career criminal.  In fact, the

evidence of malfeasance during the trial shows that the government knew they would have trouble

painting Reed in a bad light.  Thus, the patently misused quote from his book (see para. 44), and

used the lies setup between the prosecutor and the FBI agent (see para. 53-55).

92.         The real reason for the sledgehammer prosecution response of the DOJ was verbalized by the

judge, when he said that he had to deter that day from happening again (see para. 70).   There is no

doubt that by "it" he meant "insurrection."   The government created the insurrection narrative, and

targeted Reed because of it wanted to send a message of crackdown to anyone who questioned it's

legitimacy after a sketchy election.

**COUNT II:** *Violation of 5th Amendment by the DOJ against Reed Christensen*
   ** The DOJ targeted Reed with vague laws because of his political beliefs. **

93.         If there is anything in Reed's trial that shows the mindset of his jury, it is that they found him

guilty of obstructing interstate commerce.  The notion that a single individual staying one night in a

hotel, riding the subway to and from the Mall, and spending the one day at a protest, interfered with

interstate commerce and caused Safeway to lose money is nonsensical.  If the case was being made

that an insurrection caused these loses, it would require a number of points to be made and proven at

trial:

    1)  a planned and organized rebellion or insurrection existed,

    2)  the actions of the insurrection caused commerce to be blocked,

    3)  Reed was part of the insurrection.

None of these points were even attempted to be made. The best the prosecution could do is a

blatantly misleading quote from his book to falsely paint him as a troublemaker (see para. 44,45).

94.         How can an individual who is not within half a mile of VP Mike Pence be guilty of

threatening the safety of the vice-president?  (see para. 58)  The evidence of the trial shows that as

an individual Reed posed a threat to no one, as he was not guilty of causing property damage or

bodily harm.  Since all he was doing was protesting, the conclusion must be drawn that this is the reason for this charge.

95.       The observation of small groups of officers moving freely among the crowd shows that there were no safety concerns at all (see para. 59).  The charges of violence by protesters against police officers occurred in places like the tunnel after the police were ordered to forcefully and violently clear the area.

**COUNT III:**  *Violation of 6th and 14th Amendment  by DOJ against Reed Christensen*

**\*\* Reed did not receive a fair trial or due process because of lying prosecutors. \*\***

96.       No government prosecutor is legally or ethically allowed to use purposeful lies to push a case to successful conclusion.  Doing so violates legal, ethical, and professional standards.  Prosecutors are court officers and are considered "ministers of justice," with a duty to seek truth and justice, not just convictions.  These are the lies of the prosecution specifically called out in this document:

  1)  the purposely misused book quote  (see para. 44),

  2)  the deceptive wording about the arrest warrant (see para. 54),

  3)  and the deceptive wording about the wanted poster (see para. 55).

Taken together, these lies show a pattern of willful and continual attempt to deceive on the part of the DOJ.

97.       This type of prosecutorial misconduct is more egregious then simply giving false testimony on the witness stand and thus corrupting a single trial.  If officers of the court and officers of the law cannot be trusted to tell the truth, then the entire edifice of the legal system is undermined.

**COUNT IV:**  *Violation of 6th Amendment by U.S. District of D.C. against Reed Christensen*

**\*\* Reed did not have an impartial jury and faced a biased court. \*\***

98.       Reed faced a jury pool that was predominantly government workers.  It can be seen by the charges against Reed (e.g. Safeway and Mike Pence) that the prosecution considered Reed part of an

insurrection against the government. The judge's comments during the trial indicate that he too held this view. How could the court allow on the jury so many people whose livelihood depend on the government that was claiming to be the aggrieved party? (see para. 41)

99.    Reed faced a biased jury because the judge did not strike jurors who admitted bias against the defendant, while automatically striking a juror who expressed bias against the government (see para. 43). Five of these admittedly biased jurors ended up on Reed's jury.

100.    In front of the jury, the judge challenged witness testimony, when the testimony did not conform with the prosecution narrative of an "insurrection" (see para. 46).

101.    Since the prosecution kept harping on the dreadful insurrection at my trial, the jury was conditioned to believe that I was part of the insurrection. I didn't have to specifically do anything - I was guilty by association (see para. 56).

**COUNT V:** *Violation of 8th Amendment by DOJ against Reed Christensen*
**\*\* Reed was punished with excessive persecution because of his political beliefs. \*\***

102.    The prosecution knew exactly what Reed did and didn't do on Jan6. There were probably ten or more cameras that captured his time at the police line and their trial exhibits used pictures and videos from most of them. The notion that a man who had not caused any bodily harm, who had been a model citizen his entire life, should be immediately remanded to jail has no basis in justice or equity. This action left Reed's wife alone on a country property where she had to clear off and prepare the property for sale on her own. The only reason for this type of cruelty was so that the government could send a message to political opponents.

103.    During sentencing, the prosecutor used Reed's quote from Nathan Hale as an indication that he was not remorseful and continued to "convey his political beliefs" (see para. 67). It is beyond ironic that a Federal prosecutor would use that patriotic quote as an example of political fanaticism that needs to be crushed.

**COUNT VI:** *Violation of Eighth Amendment by DOJ against Reed Christensen*
   **\*\* Unacceptable prison system conditions exacerbated Reed's punishment. \*\***

104.   The BOP, operating the Forrest City Low prison, was unable to operate a safe and healthy

environment which would allow Reed to maintain his health as evidenced by his suffering five

months of continual diarrhea (see para. 80).

105.   The BOP, operating the Forrest City Low prison did not provide sufficient food and nutrition

so that Reed could maintain a healthy body weight (see para. 81, 82).

106.   Forrest City Low prison sending Reed to the SHU without any notification of his wife caused

Reed and her cruel emotional distress.  Because the prison did not allow a notification phone call to

be made, and she had to come to Arkansas and file a lawsuit in order to have a phone call and know

that he was still alive.

**COUNT VII:** *Violation of 8ʰ Amendment by U.S. District Court D.C. against Reed Christensen*
   **\*\* Reed received excessive punishment because of his political beliefs. \*\***

107.   Reed received a 4 years of incarceration, with 3 years probation for what was simply

misdemeanor behavior.  The prosecution used a statute that linked "impeding" with "assault" in

order to get a felony conviction.  But the judge was there the entire trial, he knew there was no

property destruction or bodily harm done, yet he still gave a multi-year sentence.  The reason for this

severity was expressed when he said, "this court [has] to to deter anything like that day from ever

happening again" (see para. 70).  In other words, the sentence had nothing to do with what Reed did,

it was given to send a political message about challenging the legitimacy of the government.

108.   Nearly every Jan6 defendant was ordered to pay a $2,500 restitution, which was each

defendant's share of the damage done during the protest - two windows broken in the Capitol.  Reed

was given that penalty, as well as an additional $20,000 fine.  No other Jan6 prisoner that Reed

encountered in the J6 Gulag was given such an additional penalty.  Since it was never even alleged

that Reed damaged property or caused bodily injury, the only reason for this penalty is that it is a punishment for him writing a political book. Reed wrote the book "Save the Kid!" which combines memoir, political commentary, and self-help. It offers his perspective on developing an inner moral compass to navigate America's challenges, inspired by his Jan6 ordeals and his belief in the nation's founding principles. The judge knew at sentencing that Reed was not making big money off his book (see para. 69).

109.    During sentencing Reed's lawyer told the judge that Reed had suffered two strokes. Reed was already a senior citizen, yet the judge never asked about how these strokes affected his physical condition and his ability to handle the harsh environment of prison. Without considering these physical limitations the judge was sentencing Reed not only to incarceration, but also to accompanying pain and suffering (see para. 68).

## VI. Prayer for Relief

WHEREAS, this complaint outlines a case of actual controversy about the Jan6 protest, which is a real dispute and not a hypothetical question, and

WHEREAS, this court has jurisdiction over this matter because it raises Federal questions of violations of Amendment rights, and the court has precedence to review actions of the Executive branch as argued in the accompanying legal brief, and

WHEREAS the court is not being asked to overturn the sentence of another court, or to punish anyone by the award of monetary damages, but rather only to use the principles of Americans justice and equity to consider this case and make a wise and moral judgment,


WHEREFORE, the Plaintiff requests that this court render a Declaratory Judgment concerning the Counts listed in this motion, and asks the court to send a copy of this motion and this court's ruling

to the Plaintiff's estranged children.


**Signature**

Signed: _____    Dated: _____28 Apr 2025_____
        Reed K. Christensen

Address: ___3929 E. 2d North___

        ___Rigby, ID 83442___

Phone: ___208-681-5845___


## DECLARATIONS OF PLAINTIFF

I Reed Christensen hereby attest that the facts contained in the above Complaint are true and correct to the best of my knowledge and belief.

Signed: _____    Dated: _____28 Apr 2025_____


## CERTIFICATE OF SERVICE

I certify that the foregoing was entered with the Clerk of the Court who informed me that he/she would enter the foregoing into the court's ECF system that would then electronically serve the documents on all parties.

Signed: _____    Dated: _____28 Apr 2025_____

# Exhibit 1

Reed's father, Gary Christensen, on the flight line.



# Exhibit 2

Reed's Church Membership Record

---

*For Bishop and Membership Clerk Use Only*

The Church of Jesus Christ of Latter-day Saints
Membership Record - 27 Apr 2025

**Reed Knox Christensen**
Record number: 000-2649-9630

## Personal and Ordinance Information

|  |  |
|---|---|
| Current Legal Name | Reed Knox Christensen |
| Birth date: | ▆▆▆▆▆▆ |
| Birthplace: | San Antonio, Bexar, Texas |
| Birth country: | United States |
| Gender: | Male |
| Baptism date: | 4 Jun 1966 |
| Confirmation date: | 5 Jun 1966 |
| Elder ordination date: | 22 Aug 1976 |
| Ordained elder by: | Gary Wayne Christensen (000-2649-9606) |
| High priest ordination date: | 27 Nov 1987 |
| Ordained high priest by: | Gary Wayne Christensen (000-2649-9606) |
| Sealed to parents date and temple or BIC: | 18 Aug 1960    Salt Lake Temple |
| Endowed date and temple: | 18 Jun 1977    Cardston Alberta Temple |
| Mission country and language: | South Korea, Korean |

## Parents

| Name (birth name if applicable) | Birth Date | Record Number |
|---|---|---|
| Gary Wayne Christensen | ▆▆▆▆▆ | 000-2649-9606 |
| Iness Lorene Abbott | ▆▆▆▆▆ | 000-2649-9614 |

## Present Spouse

|  |  |
|---|---|
| Name (birth name if applicable) | Myra Ann Wright |
| Birth date: | ▆▆▆▆▆ |
| Member: | Yes, 000-1598-0197 |
| Marriage date: | 14 Jul 1979 |
| Marriage place: | Cardston, Alberta, Canada |
| Marriage country: | Canada |
| Sealed to present spouse date and temple: | 14 Jul 1979    Cardston Alberta Temple |

# Exhibit 3

Reed and Myra after being sealed in the Alberta Canada temple.



# Exhibit 4

Reed and Myra temple marriage certificate.



**MARRIAGE CERTIFICATE**

PROVINCE OF ALBERTA

*This Certifies that*

REED KNOX CHRISTENSEN *of* Spokane *in the* ~~Province~~ State *of* Washington

*and* MYRA ANN WRIGHT *of* Las Vegas *in the* ~~Province~~ State *of* Nevada

*were by me joined together in the* **Holy Bonds of Matrimony**, *for Time and for all Eternity, according to the Ordinance of God and the Laws of the Province of Alberta, in the Alberta Temple at Cardston, Alberta, Canada, on the* 14th *day of* July *in the year of Our Lord One Thousand Nine Hundred and* 79.

*In the presence of*

*An Elder of the Church of Jesus Christ of Latter-day Saints*

Ordell Zollinger *Witness*

Gary W. Christian *Witness* *License Number* 37085                13th July 1979

# Exhibit 5

Reed and his sons wearing their Eagle Scout rank.



# Exhibit 6

Defense video exhibits:
   Page 1:   requested from D.C Court
   Page 2:  request from trial lawyer

Reed K. Christensen                                                April 7, 2025
3929 E. 20 North
Rigby, ID  83442
rm@chrisfamily.org
208-681-5845

Clerk of the Court
United States District Court District of Columbia
333 Constitution Avenue, N.W.
Washington, DC 20001

Dear Clerk of the Court,

I am writing to request copies of exhibits from a trial held in the United States District Court for the
District of Columbia.  I have thoroughly examined PACER in hopes of obtaining these exhibit copies,
but none seem to be found on the site.

The details of the case and the exhibits I am seeking are as follows:

| | |
|---|---|
| Case Name: | United States of America vs Reed Knox Christensen |
| Case Title: | USA v. Christensen |
| Case Number: | 1:21-cr-00455-RCL-1 |
| Trial Dates: | September 11-18, 2023 |

Exhibits Requested (all from list "Exhibits for Defendant"):
    RC.01 Chapman BWC Video Excerpt (X6039BF76)
    RC.02 Bagshaw BWC Video Excerpt  (X6039BLAL)
    RC.03 Brown BWC Video Excerpt  (X6039BJRP)

Please let me know the process for obtaining these videos, including any applicable fees, forms, or
additional information you may require. I am happy to comply with all court policies and procedures
regarding access to trial exhibits.

If possible, I would prefer to receive the exhibits in electronic format (PDF) via email or Dropbox.

Please advise me of the total cost and how payment should be submitted.  You may contact me at the
phone number or email address listed above if you need further clarification or details.

Thank you for your assistance in this matter.

Sincerely,

Reed K. Christensen





**Retail**

U.S. PO
PM
RIGBY,
APR 07

20001

$19

R2304N



**UNITED**
**POSTAL**

**CERTIFIED MAIL**

9589 0710 5270 0097 9439 59

RDC 03

**PRIORITY**
★ MAIL ★



**UNITED STATI**
**POSTAL SERVI**

VISIT US AT USPS.C
ORDER FREE SUPPLIES ON

**FROM:**

Reed Christensen
3929 E. 2d North
Rigby, ID 83442

# FLAT RATE ENVELOPE
ONE RATE ■ ANY WEIGHT



**TO:**

Clerk of the Court
Us District Court District of Columbi.
333 Constitution AV, N.W.
Washington, DC 20001

**SENDER: COMPLETE THIS SECTION**

- Complete items 1, 2, and 3.
- Print your name and address on the reverse so that we can return the card to you.
- Attach this card to the back of the mailpiece, or on the front if space permits.

1. Article Addressed to:

Clerk of the Court
Us District Court Dist of Col.
333 Constitution Ave, NW
Washington, DC 20001



9590 9402 8819 4005 7076 09

2. Article Number (Transfer from service

9589 0710 5270 0097 9439 59

PS Form 3811, July 2020 PSN 7530-02-000-9053

**COMPLETE THIS SECTION ON DELIVERY**

A. Signature

X
☐ Agent
☐ Addressee

B. Received by (Printed Name)    C. Date of Delivery

D. Is delivery address different from item 1? ☐ Yes
   If YES, enter delivery address below: ☐ No

3. Service Type
☐ Adult Signature
☐ Adult Signature Restricted Delivery
☐ Certified Mail®
☐ Certified Mail Restricted Delivery
☐ Col         elivery
              livery Restricted Delivery
☐ Insured Mail Restricted Delivery
   (over $500)

☐ Priority Mail Express®
☐ Registered Mail™
☐ Registered Mail Restricted
   Delivery
☐ Signature Confirmation™
☐ Signature Confirmation
   Restricted Delivery

Domestic Return Receipt

Label 228, March 2016    FOR DOMESTIC AND INTERNATIONAL

# VISIT US AT USPS.C
## ORDER FREE SUPPLIES ON

## Fwd: request for exhibits, case: 21-CR-455

From: rm@chrisfamily.org
Date: Fri, 18 Apr 2025 10:35AM
To:    troy@mckeansmithlaw.com

Hi Troy,

I sent a letter to the Court (see attachment) asking for a copy of the video clips you entered as defense exhibits.
(I asked the Court directly because you had indicated to me that you had been told the exhibits were restricted
since they were based on govt video.)

They sent this reply, which indicates that I should ask you for a copy of the video clips.  In other words, this email
is indicating that there is no restriction on you giving me copies.

I would be very appreciative if you could arrange to send copies of the three video exhibits mentioned in the letter.

Thanks,
Reed

-------- Original Message --------
Subject: 21-CR-455
Date: Wed, 16 Apr 2025 20:17:59 +0000
From: DCD records <records@dcd.uscourts.gov>
To: "RM@CHRISFAMILY.ORG" <RM@CHRISFAMILY.ORG>

Good Afternoon,

The records department was forwarded over a mail in request from  Reed K Christensen. You would need to reach out to the attorney of record for the video excerpts.

Respectfully,

**Records Department**
U.S. District & Bankruptcy Courts
for the District of Columbia
333 Constitution Avenue, NW
Washington, DC 20001
9:00am - 4:00pm
Records@dcd.uscourts.gov
**Office:** (202)-354-3080

# Exhibit 7

Trial testimony about SuperSoaker spray being 10x handheld spray amount.

> Transcript Sep14, page 163, line 20

DIRECT EXAMINATION OF CHRISTOPHER REILLY                163

1    dispense multiple applications for a period of time.

2        So, for example, I believe that particular product has

3    about 1300 grams of active ingredient or material in it,

4    whereas a small handheld unit would be much smaller.  So 46

5    ounces versus, for example, 4 ounces.  So instead of 8 to 10

6    one-second sprays it has the capacity to do 25 to 30 perhaps

7    half second to one second sprays.  It is also pressurized and

8    the delivery nozzle system is set up so that it can shoot at

9    much greater distances.  So effective distances of 25, 30 feet,

10   recommended minimums typically around 10 to 12 feet.  Whereas

11   your handheld devices, recommended minimums are about 3 feet

12   within ranges up to about 10 to 15, 12 is probably your

13   average.

14       Q.  All right.  You just stated that you believe that a

15   trigger pull on MK-46 outputs 1300 grams, is that what you

16   said -- milligrams?  Did I miss that part?

17       A.  It is estimated that a one-seconde pulse or it has

18   been shown that a one second pulse with at least one product

19   manufacturer that I am familiar with will deliver about

20   50 grams of material, for an MK-46.  Whereas it will be 10 fold

21   lower, about 5 grams of material for an MK-4, which is your

22   smaller handheld devices, so essentially about 10 times.

23       You can do the math.  Right?  Number of one second bursts

24   that it is capable of delivering versus grams of material

25   inside.  Right?

Exhibit 7

## Exhibit 8

News article with "five people have died"

https://www.foxnews.com/us/capitol-riots-fbi-suspects-wanted-washington-dc-attack



## New FBI wanted posters in Capitol riot manhunt

5 people have died in connection with Capitol Hill riots

By **Stephanie Pagones**    **Fox News**

Published January 8, 2021 6:34am EST



## Exhibit 9

Washington County Prison mug shot.



## Exhibit 10

Save the Kid! Book



# Exhibit 11

FBI receipt for stroke medication.

FD-597 (Rev. 4-13-2015)                                                          Page_____1____ of ___1___

## UNITED STATES DEPARTMENT OF JUSTICE
### FEDERAL BUREAU OF INVESTIGATION
### Receipt for Property

Case ID: 89B-WF-3368293-19LAFO

On (date) 04/25/2021                    Item (s) listed below were:
                                        ☒ Collected/Seized
                                        ☐ Received From
                                        ☐ Returned To
                                        ☐ Released To

(Name) _____

(Street Address) 3020 SW 325th Avenue

(City) Hillsboro, Oregon

Description of Item (s): _____

(1) - PILL BOTTLE w/ LISINOPRIL 10 MG TABLETS

(2) - PILL BOTTLE w/ BACLOFEN 5MG TABLETS

(3) - PILL BOTTLE w/ CLOPIDOGREL 75MG TABLETS

(4) - PILL BOTTLE w/ ATORVASTATIN 40MG TABLETS

TFO OPITZ WILL BE TRANSPORTING THE MEDICATION FROM
THE RESIDENCE TO THE WASHINGTON JAIL WHERE REED
CHRISTENSEN IS BEING LODGED.              (5)

Received By: _____        Received From: _____
                    (Signature)                                    (Signature)

Printed Name/Title: _____         Printed Name/Title: _____

Exhibit 11

## Exhibit 12

Link to my 18 minute election integrity video during governor campaign.

https://rumble.com/vyzu6e-republicans-in-oregon-should-unitedly-reject-vote-by-mail..html



**Republicans in Oregon should unitedly reject vote-by-mail.**

     

# Exhibit 13

Court transcript references for jurors employed by the government.

From the transcript, these six jurors worked for the government:
0901  Sep 11, page 61, line 2
 259  Sep 11, page 62, line 16
1035  Sep 11, page 95, line 23
1711  Sep 11, page 102, line 11
1056  Sep 12, page 60, line 18
0817  Sep 12, page 54, line 1

# Exhibit 14

Transcript references that show 20 jurors interviewed who said that they could not be impartial.

    Jury pool from transcript who could not be impartial:
      0058  Sep 11, p50, line 19
      0657  Sep 11, p69, line 18
      0733  Sep 11, p80, line 18
      *2132  Sep 11, p83, line 20
      *1035  Sep 11, p94, line 15
      *1711  Sep 11, p100, line 19
      2000  Sep 11, p122, line 24
      1576  Sep 11, p131, line 4
      0996  Sep 12, p9, line 13; Sep 12, p10, line 9
      *0169  Sep 12, p17, line 7
      1074  Sep 12, p26, line 7
      0077  Sep 12, p67, line 23
      0085  Sep 12, p78, line 9
      0247  Sep 12, p104, line6; p106, line 3
      1548  Sep 12, p118, line 10
      0631  Sep 12, p128, line 25
      *0626  Sep12, p135, line 24
      2070  Sep 12, p143, line 7
      *2148  Sep 12, p182, line 20
      0429  Sep 12, p190, line 16

    * These six biased jurors were on the jury.  (2148 was alternate)

# Exhibit 15

Transcripts that show that judge struck a man from jury consideration who was dubious about FBI.

Juror 0004
– trust in FBI has plummeted Sep 12, page 34, line 5
– FBI failure, corruption  Sep 12, page 38, line 12
– struck by judge  Sep 12, page 163, line 21

34

1    a fair and impartial juror, that have criminal prosecutor, FBI
2    agents, federal government, general military service, law
3    enforcement, you said yes.  So tell me little more of which of
4    those prompted your response.
5            A JUROR:  I think just in general, I remain
6    skeptical of the federal government.  And I have my level of
7    trust in the FBI has plummeted in recent years.
8            THE COURT:  Just from the general news these days?
9            A JUROR:  There is all kinds of specific examples
10   where there has been gross negligence or evidence that it has
11   become politicized.
12           THE COURT:  Okay.  32 is that you, member or close
13   friend live or work near the Capitol on January 6.
14           A JUROR:  We live five blocks away.  I was working
15   from home.  My wife was working just four blocks away.
16           THE COURT:  And she was home.  Were you home too?
17           A JUROR:  I was at home.  She was actually in at the
18   time what was my office studying for the Bar exam.
19           THE COURT:  Okay.  So she was at Covington?
20           A JUROR:  No, not yet.
21           THE COURT:  Okay.  Where was she?
22           A JUROR:  At the time, she was at a health care
23   regulatory advisory firm here in DC.
24           THE COURT:  But you were at home?
25           A JUROR:  I was working from home that day, yeah.

38

1    views about the FBI.  This case was, of course, investigated
2    by the FBI.  And, of course, it is being prosecuted by the US
3    Attorney's Office here.  Does that pose a problem for you in
4    terms of your views about the FBI?
5            A JUROR:  I mean, my -- it wouldn't impede me from
6    making a -- being a --
7            THE COURT:  I'm sorry?
8            A JUROR:  It would not impede me from being a fair
9    and impartial juror.
10           THE COURT:  Tell us more about how you came to your
11   views about the FBI.
12           A JUROR:  Where to start?  Well, let's see.
13   Yesterday was 9/11.  There has been evidence that they knew
14   about the hijackers.  There is oftentimes evidence that they
15   know about school shooters.  You know, they have bungled a
16   number of high profile cases in recent years from, you know,
17   the Hunter Biden laptop to the Steele dossier.  They are
18   just -- it kind of seems to me like they have become
19   politicized.  And, you know, they are going to the four
20   corners of the earth to get these bozos that went in the
21   Capitol, but there is violent murders and shooters and
22   terrorists that are out there getting away from them.
23           THE COURT:  Okay.  Any reason to hold that against
24   them in this investigation or this trial?
25           A JUROR:  I mean, not necessarily.  It is --

Exhibit 15

163

```
1            MS. REED:  Yes, Your Honor.
2            THE COURT:  Is that what you have?
3            MR. BEACH:  0004.
4            MR. NIXON:  So just for clarity sake, 1074, ████
5   ████ is still qualified; correct?
6            THE COURT:  I had -- ████████ is the one I
7   recovered on; correct?
8            MS. REED:  Judge, 0004 was reserved on.
9            THE COURTROOM DEPUTY:  Yeah.  The one right below
10  1074 was the one you reserved on.
11           He was the one --
12           THE COURT:  Okay.
13           THE COURTROOM DEPUTY:  And then 1074 is qualified.
14  He was qualified as --
15           THE COURT:  Okay.
16           MR. MYKYTIUK:  Just to clarify that is the
17  government's motion.
18           MS. REED:  Correct.
19           THE COURT:  It is not 1074 then it is 0004 --
20           MS. REED:  Yes, Your Honor.
21           THE COURT:  -- is the one that would be stricken.
22  That I reserved on and is now stricken, so it is 0004.
23           (Pause.)
24           THE COURT:  Okay.  So we have got 1676.
25           THE COURTROOM DEPUTY:  Juror 1676.
```

Exhibit 15

# Exhibit 16

Transcript where prosecutor in opening misused my book quote – Sep 13, page 23, line 4

1           With that, we'll start with the government's opening
2     statement.
3                         OPENING STATEMENT
4           MS. REED:  Thank you.  "The point of a protest is not
5     to make your voices heard, to wave signs, give speeches, chant
6     and cheer.  A rally in the street has very little to no effect
7     on a politician, but a small group causing trouble, that is an
8     entirely different matter."  Ladies and gentlemen, the words
9     before you are the words of the defendant.  These are the
10    words, an excerpt of a longer statement that he wrote in a
11    self-published book in the aftermath of January 6, 2021.
12          And there is some truth to what he did write.
13    Because the events that occurred at the US Capitol on
14    January 6, 2021, those are acts that were done at the hand of
15    the defendant and the hand of other mobs, other rioters who
16    participated as a mob in the acts of January 6.  Those acts,
17    ladies and gentlemen, as you will come to learn, over the
18    course of the next few days, the evidence is going to show,
19    that the defendant's acts, the acts of the mob, that was
20    trouble.
21          Not the kind of trouble that is of a protest or a
22    rally, it is trouble of a different kind.  The defendant's
23    words provide a window into his mindset on January 6.  They
24    speak directly of his intentions of what he did when he went on
25    the Capitol grounds on January 6.

Exhibit 16

# Exhibit 17

Pages from my book that show real context of quote – Chap 12, pages 79 - 82

SAVE THE KID!

rain forest. During one outing at camp, I remember encountering a lush field of ferns that towered over my head, and thought I wouldn't have been too surprised to see a dinosaur reaching down to munch on them.

So we pulled out the map, took a compass bearing across the forest that would lead us just to the east of the next waypoint, and proceeded to bush crash. The only way the shortcut would work was to be perfectly on course. Even a small variation across the long distance would cause us to be uncertain about the location of the waypoint and to waste time searching for it. Many times we were on hands and knees getting through dense vegetation in order to keep a perfectly straight path.

And it worked! Our course completion time was top notch, and my confidence in using a compass was greatly increased. Later, as a new Second Lieutenant in the Army, I never had the problem of being "bewildered" about my location.

From this experience, an analogy can be made that the solution to navigating the dense forests of life, which obscure the morally straight path, is to *use a compass*! Each person on the course of life needs to make constant use of an internal moral compass. The next chapters will reveal what can be used as a moral compass and how it can be used.

The main moral problem in American politics today is people are confused about what to use as a guide. Most people have an inherent understanding of right and wrong, but they cannot seem to find the true path between them. Their problem is in their use of a compass.

78

# Chapter 12 – Finding the Right Compass

A religious person is totally familiar with the concept of an internal moral compass. The main point of a spiritual life is to acknowledge a higher power for truth that exists outside of the worldly constructs of men, and that God has eternally defined what is good and right. This true morality is usually not aligned with human legal constructs, and is most definitely *not* a social construct of the current time, and is not up for debate. A dedicated religious disciple can spend a lifetime improving his obedience to the higher laws of Heaven.

Yet despite the blessing of having a solid spiritual moral compass in the Western world based on Judeo-Christian teachings, the traditional religion of the West is a moral compass not directly concerned with politics.

This was a difficult concept for the early Jewish people who followed Christ as the Messiah. Jesus taught that he came to earth to establish the Kingdom of Heaven. He was not here to help the Jews overcome the political oppression of Rome, but to bring the grace for individual salvation by overcoming sin with repentance. Jesus beautifully summarized this in the famous phrase,

> *Render therefore unto Caesar*
> *the things that be Caesar's,*
> *and unto God the things which be God's.* *

It should be remembered that the early Christian church grew and spread widely in the Roman political system (which was, at this later point of their history, a dictatorial empire that

* Luke 20:25  King James version of the Bible

79

Exhibit 17

embraced slavery in a big way). Such growth indicates that much of the time, Christians —who were attempting to follow their inner spiritual compass—were not continually hunted for extermination. Rather, they only suffered martyrdom during distinct periods of intense persecution.

Roman records indicate that civic leaders recognized the moral teachings of Christianity actually created good citizens, but that Christians were at odds with the religion of the Empire.[xxxii] Starting with a ruling from Emperor Trajan, throughout the second century and part of the third, it was imperial policy not to seek out Christians for persecution, but still to punish them when they were brought before the authorities.[xxxiii]

Thus the most common pitfall for early Christians was getting involved with the legal system and courts of Rome. Those courts required an oath to the Roman pantheon of gods, much like the truthfulness oaths of American courts on the Bible. These oaths included an acknowledgment that the Emperor was a god on earth.[xxxiv] That was a big problem for Christians who were determined to follow their spiritual moral compass that there is only one God—and that one God was definitely not the often reprehensible guy on the throne of Rome. A legal case was a deadly danger, since a contempt of court charge back then was swiftly punished at the end of a sword.

Today in America, religious individuals and leaders get involved in politics due to moral issues as local, state, and federal governments stray further away from the Judeo-Christian roots of the American Founding. Yet many of the hot political issues of the day—like mask directives, quarantine lockdowns, and government-enforced vaccine

mandates—are often viewed as issues belonging to Caesar and do not register on that moral compass.

However, there is a moral compass that is constantly and openly applied to politics in America. It is strongly held by a large segment of the population and is commonly used to guide people to disregard the law. The moral compass in mind is that which belongs to the political Left.

If that statement seems jarring to you, it shouldn't be. The evidence for the existence of the inner moral compass of the Left is irrefutable. I was born in 1958, and I was old enough to observe the world of the late 1960s. Ever since that time, the American Left has engaged in "protests" that have proven the existence of its moral compass. The law breaking and violence of those events are always excused with the claim they are being done in the service of a higher cause.[xxxv]

As noted in the story of the Greenhorn protesters and the allegory of the Kid, the American Right is a latecomer to the political protest. And to this day, the Right has no idea what makes a "successful" protest. The point of a protest is not to "make your voices heard," especially not in the literal way conservatives take that statement—to mean you wave signs, give speeches, chant, and cheer. That is not a protest; it is a rally. People making noise on the street is not where political power comes from in America. Real political power comes from the election system, and a politician has nothing to fear from a rally on the street—even if they are noisy.

No, the success of the Left in continually assaulting and dismantling American traditions, heritage, and history for my

Exhibit 17

entire lifetime is due to their knowledge that a successful protest causes *trouble.*

A rally on the street has very little to no effect on a politician, but a small group causing trouble is an entirely different matter. For years the *trouble* aspect of a Democrat protest consisted of things like occupying buildings, blocking roads, and some battling of police. However, the Black Lives Matter protests of 2020 saw the Left add arson, destruction of property, and assault to the list of acceptable trouble from a protest.

No constituency likes to see trouble in their community, so a politician will quickly cave in response to it. The easiest and most expedient thing for a politician to do is to quickly meet the demands of the protesters and to send some money their way.

And by the way, the work of Martin Luther King Jr. and the Civil Rights protests of the 1960s[xxxvi] were most assuredly *not* a success belonging to the Left. It was an *American* success, because it turned America closer to a truth of its founding that all men are created equal. The moral compass that guided the "trouble" of civil disobedience by Dr. King and so many Americans of all political persuasions, was the religious moral compass that says all men are created equal before God—no matter what the laws of the state said. (Remember Dr. King was a *reverend* and spoke constantly of the spiritual aspects of the struggle.)

By way of contrast, the BLM protests of 2020 were a success of the Left. They condemned the entire concept of America, led to increased racial animosity, and violated the rights and safety of fellow citizens—not to mention the destruction of life, property, and order that should be a hallmark of a civil

society. And true to tradition, the politicians caved and bowed to the demands of these protests.

Any human being who is not a psychopath will realize that destroying the civilization and culture by dismantling the laws and order, which provide your living environment, is a dangerous thing to do. So how can so many people support it? The answer is they respond to an inner moral compass that they see taking precedence over the laws and customs of society. What the Right sees as "barbarians at the gates," the Left sees as righteous and superior moral actors.

It can be challenging to identify the moral compass of the Left, because their tactic *du jour* is constantly changing. However, whether the reason for their current condemnation of America is due to financial inequity, immigration, racism, homelessness, same-sex attraction, or cross-sex dysphoria, the thing these condemnations all have in common is their root in the goal of the Left to create a socialist utopia.

Yes, a vision of a socialist utopia is the inner moral compass of the Left. This is the reason why no amount of American progress or improvement in society will ever be enough. America, as it was founded, can never measure up to this imagined perfection, so the Left's morality dictates that America itself must be removed. Paraphrasing what was so infamously said of Stalin, if a few eggs (or heads) need to be cracked to cook the omelet of utopia, it is surely worth the price.[xxxvii]

What about those on the Right who have a positive view of America?

Exhibit 17

# Exhibit 19

Transcript testimony of Officer One – Sep 14, pages 20-23

1  recover a firearm from the -- that was thrown to me during that
2  time.
3      Q.  Just to clarify that is the firearm that was recovered
4  on the lower west terrace around the time of the video we just
5  watched?
6      A.  Yeah.  Sometime in that time frame when I was on the
7  west front lawn there was a weapon recovered from a person.
8  And it was actually an officer got it and he actually handed it
9  to me.  So a period of time I actually had the gun with me.
10     Q.  It had been dropped or --
11     A.  I don't know the circumstance if it was dropped or if
12  an officer pulled it off another person, but that was there.
13  Also prior to getting to the Capitol earlier in the day, we
14  were receiving many reports of people with guns.  And then we
15  also had encountered people that had -- there were people that
16  were carrying portions of guns, but not -- it was odd in what
17  was being done.  They were carrying pieces of guns, so that
18  they weren't technically against the law, because it was not a
19  complete gun.  They were doing it with the appearance that they
20  had a gun.
21     Q.  Did the crowd -- you described their demeanor.  Did it
22  seem they had a unified goal or intent'
23     A.  Yes.  I mean, like I said, you are out there on this
24  lawn and you are facing the people and thousands of people.
25  And as I mentioned, I talked about the energy and whatnot, but

1  they are slowly pushing against the fence.  And there are
2  fights breaking out here and there.  And then the energy of the
3  taunting or the, you know, the obscenities being yelled and
4  shouted and whatnot that, yes, I would say collectively it was
5  a common goal at that point.
6          MR. BEACH:  Could we pull up Government Exhibit 506?
7          THE COURT:  The goal was to get in the building,
8  wasn't it or not?
9          THE WITNESS:  So as we come to found out about the
10  insurrection, yes.  But at the time, you are out there and as I
11  mentioned, Your Honor --
12         THE COURT:  They just want to get forward?
13         THE WITNESS:  I am maintaining the line.  At that
14  point, people are trying to get past the line.
15         THE COURT:  They just want to get past the line?
16         THE WITNESS:  That is my perception at that point.
17         THE COURT:  Not that they wanted to get in the
18  building?
19         THE WITNESS:  I am assuming that is the end goal, but
20  at the time my goal is to preserve the line.
21         THE COURT:  Just to keep the line, that is all you
22  were doing?
23         THE WITNESS:  At that point, yes.
24         MR. BEACH:  Move to admit and publish 506.4.
25         THE COURT:  What is the number?

Exhibit 18

REDIRECT EXAMINATION OF ~~JASON BAGSHAW~~ Chapman    20

1   BY MR. BEACH:

2       Q.  Do you recognize this?

3       A.  Yes.

4       Q.  What is it?

5       A.  This is my BWC footage.

6       Q.  What is the time?

7       A.  14:23 hours.

8       Q.  Is that 2:23?

9       A.  2:23.  I'm sorry.

10      Q.  No.  We are okay.  We are the ones who need help.

11  And let's play.

12          (Video played.)

13  BY MR. BEACH:

14      Q.  If we can pause there.  So what happened?

15      A.  The crowd was starting to pull on the fence and it

16  started to kind of come apart.  And then I was kind of rushed

17  at by an individual.  And I OC sprayed them.  And then right as

18  that occurred, I was OC sprayed and I was sprayed by somebody

19  out in the crowd.  And that was me kind of walking around

20  because I had been sprayed.

21      Q.  If we could pull up 502.1.  We are going to go into

22  that a little more closely, just a different exhibit.

23          MR. BEACH:  Move to admit and publish Exhibit 502.1.

24          MR. NIXON:  No objection.

25          (Conference held at the bench.)

REDIRECT EXAMINATION OF ~~JASON BAGSHAW~~ Chapman    21

1       THE COURTROOM DEPUTY:  Your Honor, he said no

2   objection.

3           (End of bench conference.)

4       THE COURT:  With no objection, it is received.

5       MR. BEACH:  I'm sorry.  I misheard.

6           (Whereupon, Government Exhibit No. 502.1 was

7   admitted.)

8   BY MR. BEACH:

9       Q.  Let's play this one.

10          (Video played.)

11  BY MR. BEACH:

12      Q.  Pause.  Is this the same video with added video and

13  pauses to help us see what is happening?

14      A.  Yes.

15      Q.  And what does it appear is happening --

16          THE COURT:  Is this from your body cam?

17          THE WITNESS:  I'm sorry?

18          THE COURT:  This is still your body cam; right?

19          THE WITNESS:  Yes, sir.

20  BY MR. BEACH:

21      Q.  What does it appear is happening in the bottom right

22  of the screen?

23      A.  There is a gloved hand grabbing onto my right arm.

24      Q.  And what are you -- what are you doing with your right

25  hand?

Exhibit 19

REDIRECT EXAMINATION OF ~~JASON BAGSHAW~~ Chapman    22

1     A.  I am holding onto the bike rack to keep it from being

2  taken down.

3     Q.  Okay.  And let it play.

4        (Video played.)

5  BY MR. BEACH:

6     Q.  We can pause there.  Thank you.  So after you were

7  attempting to hold that bike rack, you said you were charged at

8  or I think that is the language you used.  Could you describe

9  that interaction with more detail?

10    A.  Yeah.  I was holding onto the bike rack and an

11 individual had grabbed my arm.  And then I had sprayed him and

12 then he charged at me and I pushed him away.

13    Q.  So did he make it all of the way to you, despite your

14 spray?

15    A.  Yes.

16    Q.  And what type of physical interaction happened there?

17    A.  He kind of like reached for me, kind of grabbed my

18 body and I had to push him away with my right hand.

19    Q.  So if we could just go -- play until I think 10

20 seconds or maybe 15.

21        (Video played.)

22 BY MR. BEACH:

23    Q.  Pause there.  So after your hand is either -- you lose

24 grip or it is removed from the fence, what does he do to the

25 fence?

REDIRECT EXAMINATION OF ~~JASON BAGSHAW~~ Chapman    23

1     A.  He is holding onto it himself.

2     Q.  Does he do anything to it or move it or --

3     A.  I can't remember from just the still image now what

4  happens to that particular fence, because -- if you could play

5  it.

6     Q.  Okay.  It is okay.  What about his left arm here?

7     A.  His left arm, he is trying to block the OC spray that

8  I was spraying at him.

9     Q.  And do you think he successfully blocks that spray

10 with his left arm as he is coming towards you here?

11    A.  Yes.

12    Q.  And we can play from here.  And pause.

13    That physical interaction, if it hadn't happened what

14 would you be doing in this moment?

15    A.  I would still be on this police line with the bike

16 racks preventing this crowd from trying to come onto the

17 Capitol grounds, but because this had happened, it prevented me

18 from doing the job that I had that day.

19    Q.  Okay.  Let's back up to your first interaction with

20 the man in the yellow gloves.  If we could pull up 502.16.  Is

21 this also a body-worn camera image from your camera?

22    A.  Yes, it is my body camera.

23    Q.  And what is the time now?

24    A.  It is 2:06.

25    Q.  So we have gone backwards in time a ways?

Exhibit 19

# Exhibit 20

Transcript testimony of Officer Two – Sep 14 pages 63, 68

DIRECT EXAMINATION OF ROBERT ENGLISH

1   A. It is hard to say exactly. The bike racks were pulled
2   open during the course of this exchange. I don't know exactly
3   the timing of it from this angle, but it was a part of this
4   struggle that the bike racks came off of our position on the
5   flank here and we were exposed.
6   Q. Do you recall the contact that you had with the
7   individual with the yellow gloves?
8   A. Not specifically.
9   Q. If we could go forward with the video, Ms. Vandy. You
10  can stop it, please. If you could pull up, please, Government
11  Exhibit 502.5.
12  Now, Mr. English, do you see yourself in this still
13  photograph?
14  A. Yes.
15  Q. Is this a still from the video that we just saw?
16  A. Yes.
17  MS. REED: And, Your Honor, at this time, we would
18  seek to admit and publish 502.5, if it has not been already.
19  THE COURTROOM DEPUTY: It has been already.
20  MS. REED: Thank you. If we could show it to the
21  jury.
22  BY MS. REED:
23  Q. Mr. English, can you see yourself here and circle for
24  the jury where you see yourself?
25  A. Yes. Right there.

CROSS-EXAMINATION OF ROBERT ENGLISH

1   Q. Staying with Exhibit 502.5, did the defendant's
2   pushing of you from the back, did that impact you from doing
3   your job?
4   A. I don't recall the particular shoving. But there was
5   so much of it at that point that all of it mattered. Seeing it
6   now, I definitely in the footage believe that it definitely
7   impacted.
8   Q. How did it impact?
9   A. I was trying to get to a recovery spot. And this
10  individual in the clip is directly getting in my way and
11  preventing me from being able to get to recovery and to be able
12  to contribute on the police line to the fighting.
13  MS. REED: No further questions, Your Honor. Thank
14  you, Mr. English.
15  THE COURT: All right. Defendant may cross-examine.
16  CROSS-EXAMINATION
17  BY MR. NIXON:
18  Q. Good afternoon, Mr. English. I am Troy Nixon. I am
19  Reed Knox Christensen's defense attorney.
20  A. Hello.
21  Q. Thank you for coming in to answer these questions.
22  When was the first time you remember seeing Mr. Christensen
23  that day?
24  A. I don't remember Mr. Christensen specifically.
25  Q. And you didn't speak with Mr. Christensen at any

Exhibit 20

Exhibit 21

Transcript testimony of Officer Three – Sep 14, pages 76, 80-81, 83

1    They were wanting to get past us and get into the building.

2    Then there was just -- they were more as the day went on, they

3    were getting more -- the individuals were getting more vocal

4    and wanting to get past.

5        Q.  And were there other -- were there any incidents of

6    violence happening along the line?  You have described pulling

7    at bike racks, but other types of violence?

8        A.  At the time, there were groups pulling on the bike

9    racks trying to get past, trying to take them down.  But at

10   that point, the -- while the fence was still up, the violence

11   was still just -- minimum to pulling on the fencing.

12       Q.  But did you witness or experience any objects being

13   thrown?

14       A.  Yes, they were -- they were objects being thrown to

15   officers, water bottles, whatever they could have.  Some of the

16   fencing had broke -- the fencing had broken at that point --

17   the little black fencing I circled was broken and that was

18   being thrown at officers.

19       Q.  Pieces of the fencing?

20       A.  Pieces of the small, black fencing.

21       Q.  How would you compare the riot on the lower west

22   terrace to the others that you worked in your time at Capitol

23   Police?

24       A.  The riot on the lower west was nothing compared to

25   what I have worked prior.

1    could see as a weapon, so I maintained to keep my hands open

2    and free in case I needed to adjust my level of force.

3        Q.  But the situation when the fence was removed prompted

4    you to think about pulling it out at that moment?

5        A.  Yes.

6        Q.  And play.

7        Pause.

8        Could you describe the actions of the individual in the

9    yellow gloves?

10       A.  At this time, the individual with the yellow gloves is

11   attempting to -- appears to be trying to get past me or to get

12   past me, to get closer to the stairs up to go up to the

13   building.

14       Q.  But if all he was doing was trying to get past you,

15   wouldn't he be trying to walk to your right or to your left?

16           MR. NIXON:  Objection, Your Honor, leading.

17           THE COURT:  Sustained.

18   BY MR. BEACH:

19       Q.  What direction is he stepping in this picture?

20       A.  He is coming right at me.

21       Q.  What is he doing with his hands?

22       A.  He is bringing his hands up towards his face.

23       Q.  And let it play.

24           (Video played.)

25   BY MR. BEACH:

Exhibit 21

DIRECT EXAMINATION OF JOHN ERNST                    81

1    Q.  Pause.
2        What did he do with his kind of yellow gloved hands right
3    there?
4    A.  He put his hands on me.
5    Q.  And how did this physical interaction affect you in
6    the moment?
7    A.  I just wanted him to get back -- I wanted him to get
8    back and to not fight.
9    Q.  Did the interaction occupy you, is that fair to say?
10   A.  Yes.
11   Q.  Such that if other rioters attempted to get around
12   you, would you have been able to block them?
13   A.  No.
14   Q.  And play, please.
15       Pause.
16       After your initial push, did that successfully deter this
17   individual?
18   A.  Initially, once I pushed him back, he rejoined the
19   crowd.  So that my first attempt was successful in preventing
20   him from going -- preventing him from further attack.
21   Q.  In the last few moments, if we could go back maybe 4
22   seconds, is he deterred permanently or does he do anything
23   else?
24       Maybe to the middle of the video, please.  Yep.  And play.
25   Pause.

DIRECT EXAMINATION OF JOHN ERNST                    83

1    Q.  Okay.
2        And continue slide by slide, please.  Pause.
3        Can we see under that red arrow -- could you describe the
4    conduct you can see under the red arrow from the man in the
5    yellow gloves?
6    A.  The conduct with the man with the yellow gloves is the
7    same as he did with me, he went towards the metropolitan
8    officer and is pushing against him.
9    Q.  And click forward, please.  And pause.  Were you
10   giving commands or do you remember officers around you giving
11   commands around these interactions?
12   A.  Yes.
13   Q.  What types of commands?
14   A.  The commands of get back, get back were being issued
15   by myself and other officers.
16   Q.  Did you consider using OC spray on this individual in
17   the yellow gloves?
18   A.  I did not consider using OC spray at the time.
19   Q.  Why not?
20   A.  I did not consider OC spray at the time because I know
21   other officers had their OC sprays out.  And if their spray was
22   ineffective, I would still be able to use mine if need be.
23   Q.  And earlier you said you wanted to have your hands
24   free, just talk about what having hands free does for you in
25   situations like this.

Exhibit 21

# Exhibit 21.1

Transcript testimony of "trying to hit" changed to "trying to touch" - Sep 14, page 92, line 14

DIRECT EXAMINATION OF JOHN ERNST

92

1   Q.  So this is the angle from an officer standing a little

2   further to the right from the two of you?

3   A.  Yes.

4   Q.  And if we go back just a second or two seconds, maybe

5   three or four seconds, I apologize.  These videos can be tough

6   sometimes.  And just click through frame by frame.  Pause.

7   The officer in the green, what is his left hand doing

8   there?

9   A.  His left hand is blocking the man in the yellow

10  gloves' hands.

11  Q.  If that officer -- if that left hand didn't block the

12  individual's right hand in the yellow gloves, what does it look

13  like the individual is trying to do with that right hand?

14  A.  He is trying to -- trying to hit the -- trying to

15  touch the officer in one way or another, hit the officer.

16  Q.  And just click through, please.  And the individual in

17  the yellow gloves what is his left hand doing?  How would you

18  describe it?

19  A.  He has a closed left hand.

20  Q.  And play to the end.

21      (Video played.)

22  BY MR. BEACH:

23  Q.  Eventually, what happened at the end of that video?

24  A.  Eventually the man with the yellow gloves retreats

25  back towards the crowd at the time after engaging the second

Exhibit 21.1

# Exhibit 22

Transcript of prosecutor speculation  - Sep 14, page 87, line 9 and page 91, line 11

DIRECT EXAMINATION OF JOHN ERNST                    87

1    BY MR. BEACH:

2        Q.  Officer Ernst, is this the same interaction but from

3    yet another angle kind of a side shot?

4        A.  Yes.

5        Q.  And how would you describe what the individual is

6    doing with his yellow gloved hands?

7        A.  He has his one hand on my arm and his other arm is up

8    close -- in our two faces.

9        Q.  Is that right hand in a position where he could swing

10   a strike at you?

11       A.  Yes.

12       Q.  Were you concerned about that?

13       A.  It was a possibility that he could have struck me in

14   the face when his hand was raised between ours.

15       Q.  So what are you doing to respond?

16       A.  I have my other hand on his arm to prevent him from

17   striking me.

18       Q.  Okay.  If this were a video, would you go on to

19   successfully push him away?

20       A.  Yes

21            MR. BEACH:  Exhibit 505.1, please.  Move to admit and

22   publish.  I'm sorry, one second.  Pause.

23            Move to admit and publish.

24            MR. NIXON:  No objection.

25            THE COURT:  Received.

DIRECT EXAMINATION OF JOHN ERNST                    91

1    flailing, moving without intention or did it seem like he was

2    moving with intention?

3        A.  He at the time he was moving with a purpose, with

4    intention.

5        Q.  And what was that purpose or intention?

6        A.  The intention to get past the officer in front of him

7    by whatever means he needs.

8        Q.  You say whatever means he needs?

9        A.  Yes.

10       Q.  Meaning?  What do you mean by that?

11       A.  Meaning, that he would fight if need be to get past

12   the officer.

13            MR. BEACH:  Exhibit 501.2, please.  501.2.  Move to

14   admit and publish.

15            MR. NIXON:  No objection.

16            THE COURT:  Received.

17            (Whereupon, Government Exhibit No. 501.2 was

18   admitted.)

19   BY MR. BEACH:

20       Q.  And play, please.

21       Pause.

22       What did we just see here?

23       A.  The individual with the yellow gloves coming --

24   going -- moving forwards to myself and the other Metropolitan

25   officer.


Exhibit 22

# Exhibit 23

Reed's interview, shown at trial as government exhibit 701 (701.1, 701.2)

Exhibit 24

FBI agent says I was never *charged* with walking on the grass – Transcript Sep 14, page 121, line 7

DIRECT EXAMINATION OF RILEY PALMERTREE           121

1   investigation?

2       A.  Yes.

3       Q.  What were they?

4       A.  That he grabbed the barrier, grabbed the bike rack and

5   did get past it, for one.

6       Q.  What was the one inconsistency that he mentioned?

7       A.  There were a few.  That he was charged with walking on

8   the grass was one.  I think in one statement he said that the

9   pepper spray hit him and he was wiped out, he was knocked out.

10  But that is not what I saw.  Pepper spray hit him and he

11  kept -- he stuck around for a while.

12      Q.  That is what the videos have shown consistently?

13      A.  Yes.

14      Q.  Did he deny assaulting officers in the video footage?

15      A.  Yes.

16      Q.  In your investigation, did it indeed show that he

17  assaulted officers?

18      A.  Yes.

19      Q.  Now, in addition to the two interviews that we just

20  saw, did you learn Mr. Christensen authored a book after

21  January 6?

22      A.  Yes.

23      Q.  I know that it has a longer title, but "Save the Kid,"

24  is that what you are familiar with?

25      A.  Yes, I am familiar with "Save the Kid."

Exhibit 24

# Exhibit 25

"NO," never on wanted list – Transcript Sep 14, page 129, line 14

DIRECT EXAMINATION OF RILEY PALMERTREE                129

1        And we are looking, just for the record, at

2    Exhibit 1004.1.  And now if we could go back to 1004.2, please.

3    And now 1004.3.

4        Thank you.

5    BY MS. REED:

6        Q.  1004.3, Special Agent Palmertree, the yellow gloves,

7    was that significant in this investigation?

8        A.  Yes.

9        Q.  And what is depicted in 1004.3?

10       A.  Yellow work gloves.

11       Q.  And that is Mr. Christensen at his residence prior to

12   January 6?

13       A.  Yes.

14       Q.  Was Mr. Christensen ever placed on the FBI top 10 most

15   wanted list?

16       A.  No.

17           MS. REED:  No further questions, Your Honor.

18           THE COURT:  All right.  Mr. Nixon.

19           MR. NIXON:  No questions for this witness.

20           THE COURT:  All right.

21           All right.  You may step down.

22           THE WITNESS:  Thank you, Your Honor.

23           THE COURT:  Any other witnesses for the government?

24           MS. REED:  Your Honor, the government has no

25   additional witnesses for its case in chief, so we would rest at


Exhibit 25

## Exhibit 26

DOJ statement in press release that I was #191 on their wanted poster.

https://www.justice.gov/usao-dc/pr/oregon-man-sentenced-prison-felony-and-misdemeanor-charges-related-jan-6-capitol-breach



**United States Attorney's Office**
District of Columbia

**Press Release**

# Oregon Man Sentenced to Prison on Felony and Misdemeanor Charges Related to Jan. 6 Capitol Breach

Friday, January 12, 2024

...

 This case was investigated by the FBI's Washington and Portland Field Offices, which listed Christensen as #191 on their seeking information photos. Valuable assistance was provided by the U.S. Capitol Police and the Metropolitan Police Department.

Exhibit 27

Transcript quote from FBI agent that I was yelling, shouting – Sep 14, page 112, line 10

112

DIRECT EXAMINATION OF RILEY PALMERTREE

1    Q. Did you ever find any video where people were peaceful

2    on the lower west terrace?

3    A. I can't say I have found video where I would describe

4    individuals as being peaceful on the lower west terrace.

5    Q. Why wouldn't you say that?

6    A. Many, if not all of the videos I have seen, there is

7    any number of people at any given time at the very least

8    yelling, shouting, taunting officers on the other side of the

9    barricades.

10   Q. And that eventually included Mr. Christensen; correct?

11   A. Yes.

12   Q. Was an arrest warrant issued for Mr. Christensen as a

13   result of his conduct on January 6?

14   A. Yes.

15   Q. And after the arrest warrant was issued, was it

16   executed and where was it executed?

17   A. That warrant was issued here in the District of

18   Columbia. And that warrant was executed in near

19   Mr. Christensen's home where we were assisted by Washington

20   county out in Portland, Oregon.

21   Q. Following the execution of the arrest warrant, was a

22   search warrant done at Mr. Christensen's residence?

23   A. Yes.

24   Q. And I think everybody probably knows what a search

25   warrant is. But if you could just explain briefly, what is the

Exhibit 27

# Exhibit 28

Acknowledgment of FOIA request from the FBI.

Letter from FBI saying unable to find J6 Wanted Posters.



**U.S. Department of Justice**

**Federal Bureau of Investigation**
*Washington, D.C. 20535*

April 14, 2025

MR. REED KNOX CHRISTENSEN
3929 EAST 20 NORTH
RIGBY, ID 83442

FOIPA Request No.: 1665247-000
Subject: CHRISTENSEN, REED KNOX

Dear Mr. Christensen:

This acknowledges receipt of your Freedom of Information/Privacy Acts (FOIPA) request to the FBI. Below you will find check boxes and informational paragraphs about your request, as well as specific determinations required by these statutes. Please read each one carefully.

☑    Your request has been received at FBI Headquarters for processing.

☑    You submitted your request via the FBI's eFOIPA system.

   ☑    Future correspondence about your FOIPA request will be provided in an email link unless the record file type is not supported by the eFOIPA system.

   ☐    Correspondence for requests containing audio, video, or high-resolution photographs cannot be sent through the eFOIPA system. Future correspondence about your FOIPA request will be delivered through standard mail.

☐    The subject of your request is currently being processed and documents subject to the FOIPA will be released to you upon completion.

☐    Release of responsive records subject to the FOIPA will be posted to the FBI's electronic FOIA Library (The Vault), http:/vault.fbi.gov, and you will be contacted when the release is posted.

☐    Your request for a public interest fee waiver is under consideration and you will be advised of the decision if fees are applicable. If your fee waiver is not granted, you will be responsible for applicable fees per your designated requester fee category below.

☑    For the purpose of assessing any fees, we have determined:

   ☐    As a commercial use requester, you will be charged applicable search, review, and duplication fees in accordance with 5 USC § 552 (a)(4)(A)(ii)(I).

   ☐    As an educational institution, noncommercial scientific institution or representative of the news media requester, you will be charged applicable duplication fees in accordance with 5 USC § 552 (a)(4)(A)(ii)(II).

   ☑    As a general (all others) requester, you will be charged applicable search and duplication fees in accordance with 5 USC § 552 (a)(4)(A)(ii)(III).

Please check the status of your FOIPA request at www.vault.fbi.gov by clicking on "Check Status of your FOI/PA Request." Status updates are adjusted weekly. The status of newly assigned requests may not be available until the next weekly update. If the FOIPA has been closed, the notice will indicate that appropriate correspondence has been mailed to the address on file.

Exhibit 20

Additional information about the FOIPA can be found at www.fbi.gov/foia. Should you have questions regarding your request, please feel free to contact foipaquestions@fbi.gov. Please reference the FOIPA Request number listed above in all correspondence concerning your request.

If you are not satisfied with the FBI's determination in response to this request, you may proceed under any or all of the following options:

- You may seek dispute resolution services through the FBI directly by emailing our FOIA Public Liaison at foipaquestions@fbi.gov. The subject heading should clearly state "Dispute Resolution Services." Please also cite the FOIPA Request Number assigned to your request so it may be easily identified.

- You may contact the Office of Government Information Services (OGIS), who serves as the federal FOIA Ombudsman. The contact information for OGIS is as follows: Office of Government Information Services, National Archives and Records Administration, 8601 Adelphi Road-OGIS, College Park, Maryland 20740-6001, e-mail at ogis@nara.gov; telephone at 202-741-5770; toll free at 1-877-684-6448; or facsimile at 202-741-5769.

- You may file an administrative appeal by writing to the Director, Office of Information Policy (OIP), United States Department of Justice, 441 G Street, NW, 6th Floor, Washington, D.C. 20530, or you may submit an appeal through OIP's FOIA STAR portal by creating an account following the instructions on OIP's website: https://www.justice.gov/oip/submit-and-track-request-or-appeal. **Pursuant to 28 C.F.R. § 16.8(a), your appeal must be postmarked or electronically transmitted within ninety (90) days of the date of this response to your request.** If you submit your appeal by mail, both the letter and the envelope should be clearly marked "Freedom of Information Act Appeal." Please reference the FOIPA Request Number listed above in your correspondence so it may be easily identified. If possible, please provide a copy of your original request and this response letter with your appeal.

Note: Utilizing the FBI's dispute resolution services or requesting mediation through OGIS does not toll the ninety (90) day limit to file a timely appeal with OIP.

Sincerely,

Michael G. Seidel
Section Chief
Record/Information Dissemination Section
Information Management Division



**U.S. Department of Justice**

**Federal Bureau of Investigation**
*Washington, D.C. 20535*

April 15, 2025

MR. REED KNOX CHRISTENSEN
3929 EAST 20 N
RIGBY, ID 83442

FOIPA Request No.: 1665399-000
Subject: FBI Wanted List
(January 6, 2021 Participants)

Dear Mr. Christensen:

This acknowledges receipt of your Freedom of Information/Privacy Acts (FOIPA) request to the FBI. Below you will find check boxes and informational paragraphs about your request, as well as specific determinations required by these statutes. Please read each one carefully.

☑  Your request has been received at FBI Headquarters for processing.

☑  You submitted your request via the FBI's eFOIPA system.

    ☑  Future correspondence about your FOIPA request will be provided in an email link unless the record file type is not supported by the eFOIPA system.

    ☐  Correspondence for requests containing audio, video, or high-resolution photographs cannot be sent through the eFOIPA system. Future correspondence about your FOIPA request will be delivered through standard mail.

☐  The subject of your request is currently being processed and documents subject to the FOIPA will be released to you upon completion.

☐  Release of responsive records subject to the FOIPA will be posted to the FBI's electronic FOIA Library (The Vault), http:/vault.fbi.gov, and you will be contacted when the release is posted.

☐  Your request for a public interest fee waiver is under consideration and you will be advised of the decision if fees are applicable. If your fee waiver is not granted, you will be responsible for applicable fees per your designated requester fee category below.

☑  For the purpose of assessing any fees, we have determined:

    ☐  As a commercial use requester, you will be charged applicable search, review, and duplication fees in accordance with 5 USC § 552 (a)(4)(A)(ii)(I).

    ☐  As an educational institution, noncommercial scientific institution or representative of the news media requester, you will be charged applicable duplication fees in accordance with 5 USC § 552 (a)(4)(A)(ii)(II)

    ☑  As a general (all others) requester, you will be charged applicable search and duplication fees in accordance with 5 USC § 552 (a)(4)(A)(ii)(III).

Exhibit 28

Please check the status of your FOIPA request at www.vault.fbi.gov by clicking on "Check Status of your FOI/PA Request." Status updates are adjusted weekly. The status of newly assigned requests may not be available until the next weekly update. If the FOIPA has been closed, the notice will indicate that appropriate correspondence has been mailed to the address on file.

Additional information about the FOIPA can be found at www.fbi.gov/foia. Should you have questions regarding your request, please feel free to contact foipaquestions@fbi.gov. Please reference the FOIPA Request number listed above in all correspondence concerning your request.

If you are not satisfied with the FBI's determination in response to this request, you may proceed under any or all of the following options:

- You may seek dispute resolution services through the FBI directly by emailing our FOIA Public Liaison at foipaquestions@fbi.gov. The subject heading should clearly state "Dispute Resolution Services." Please also cite the FOIPA Request Number assigned to your request so it may be easily identified.

- You may contact the Office of Government Information Services (OGIS), who serves as the federal FOIA Ombudsman. The contact information for OGIS is as follows: Office of Government Information Services, National Archives and Records Administration, 8601 Adelphi Road-OGIS, College Park, Maryland 20740-6001, e-mail at ogis@nara.gov; telephone at 202-741-5770; toll free at 1-877-684-6448; or facsimile at 202-741-5769.

- You may file an administrative appeal by writing to the Director, Office of Information Policy (OIP), United States Department of Justice, 441 G Street, NW, 6th Floor, Washington, D.C. 20530, or you may submit an appeal through OIP's FOIA STAR portal by creating an account following the instructions on OIP's website: https://www.justice.gov/oip/submit-and-track-request-or-appeal. **Pursuant to 28 C.F.R. § 16.8(a), your appeal must be postmarked or electronically transmitted within ninety (90) days of the date of this response to your request.** If you submit your appeal by mail, both the letter and the envelope should be clearly marked "Freedom of Information Act Appeal." Please reference the FOIPA Request Number listed above in your correspondence so it may be easily identified. If possible, please provide a copy of your original request and this response letter with your appeal.

Note: Utilizing the FBI's dispute resolution services or requesting mediation through OGIS does not toll the ninety (90) day limit to file a timely appeal with OIP.

Sincerely,

Michael G. Seidel
Section Chief
Record/Information Dissemination Section
Information Management Division

*rec'd email 28 Apr 2025*



U.S. Department of Justice

Federal Bureau of Investigation
*Washington, D.C. 20535*

April 25, 2025

MR. REED KNOX CHRISTENSEN
3929 EAST 20 N
RIGBY, ID 83442

Request No.: 1665399-000
Subject: FBI Wanted List
(January 6, 2021 Participants)

Dear Mr. Christensen

This is in response to your Freedom of Information/Privacy Acts (FOIPA) request. Based on the information you provided, we conducted a main and reference entity record search of the Central Records System (CRS) per our standard search policy. However, we were unable to identify records subject to the FOIPA that are responsive to your request. Therefore, your request is being closed. If you have additional information pertaining to the subject of your request, please submit a new request providing the details, and we will conduct an additional search. For more information about records searches and the standard search policy, see the enclosed FBI FOIPA Addendum General Information Section.

Please see the paragraphs below for relevant information that may be specific to your request. Only checked boxes contain corresponding paragraphs relevant to your request. If no boxes are checked, the corresponding information does not apply.

☐ Please be advised that your request was reopened based on the additional information you provided. A new search was conducted, and we were unable to identify responsive records subject to the FOIPA that are responsive to your request.

☐ Records potentially responsive to your request were destroyed. Since this material could not be reviewed, it is not known if it was responsive to your request. Record retention and disposal is carried out under supervision of the National Archives and Records Administration (NARA) according to Title 44 United States Code Section 3301, Title 36 Code of Federal Regulations (CFR) Chapter 12 Sub-chapter B Part 1228, and 36 CFR 1229.10. Please be advised that the General Records Schedule (GRS) disposition authority for FOIPA records is DAA-GRS-2016-0002-0001 (GRS 4.2, Item 020).

☐ Records potentially responsive to your request were transferred to the National Archives and Records Administration (NARA). If you wish to review these records, file a FOIPA request with NARA at the following address.

National Archives and Records Administration
Special Access and FOIA
8601 Adelphi Road, Room 5500
College Park, MD 20740-6001

☐ Potentially responsive records were identified during the search. However, we were advised that they were not in their expected locations. An additional search for the missing records also met with unsuccessful results. Since we were unable to review the records, we were unable to determine if they were responsive to your request.

☐ The identification records requested are maintained by the FBI's Criminal Justice Information Services (CJIS) Division; therefore, we have forwarded a portion of your request to CJIS for processing. To check the status of this request, please contact CJIS directly at (304) 625-5590. For additional information, see the enclosed FBI FOIPA Addendum General Information Section.

☐ Requests for expedited processing are not applicable when a final response is issued within ten calendar days.

☐ Police departments should be aware that the search conducted was limited to FBI records. Requests for criminal history records or rap sheets should be directed to Criminal Justice Information Services (CJIS). Information regarding CJIS is listed in the enclosed FBI FOIPA Addendum General Information Section.

☐ Records potentially responsive to your request were transferred to the National Personnel Records Center - Civilian Personnel Records (NPRC-CPR). In order to obtain information on a file located at the NPRC, your request must be mailed to the following address.

National Archives and Records Administration
ATTN: Archival Programs
P.O. Box 38757
St. Louis, MO 63138

☐ You also requested information regarding one or more third parties. Please be advised the FBI will neither confirm nor deny the existence of such records pursuant to FOIA exemptions (b)(6) and (b)(7)(C), 5 U.S.C. §§ 552 (b)(6) and (b)(7)(C). The mere acknowledgement of the existence of FBI records on third party individuals could reasonably be expected to constitute an unwarranted invasion of personal privacy. This is our standard response to such requests and should not be taken to mean that records do, or do not, exist.

Please refer to the enclosed FBI FOIPA Addendum for additional standard responses applicable to your request. "Part 1" of the Addendum includes standard responses that apply to all requests. "Part 2" includes additional standard responses that apply to all requests for records about yourself or any third-party individuals. "Part 3" includes general information about FBI records that you may find useful. Also enclosed is our Explanation of Exemptions.

Additional information about the FOIPA can be found at www.fbi.gov/foia. Should you have questions regarding your request, please feel free to contact foipaquestions@fbi.gov. Please reference the FOIPA Request number listed above in all correspondence concerning your request.

If you are not satisfied with the FBI's determination in response to this request, you may proceed under any or all of the following options.

- You may seek dispute resolution services through the FBI directly by emailing our FOIA Public Liaison at foipaquestions@fbi.gov. The subject heading should clearly state "Dispute Resolution Services." Please also cite the FOIPA Request Number assigned to your request so it may be easily identified.

- You may contact the Office of Government Information Services (OGIS), who serves as the federal FOIA Ombudsman. The contact information for OGIS is as follows: Office of Government Information Services, National Archives and Records Administration, 8601 Adelphi Road-OGIS, College Park, Maryland 20740-6001, e-mail at ogis@nara.gov, telephone at 202-741-5770, toll free at 1-877-684-6448, or facsimile at 202-741-5769.

- You may file an administrative appeal by writing to the Director, Office of Information Policy (OIP), United States Department of Justice, 441 G Street, NW, 6th Floor, Washington, D.C. 20530, or you may submit an appeal through OIP's FOIA STAR portal by creating an account following the instructions on OIP's website: https://www.justice.gov/oip/submit-and-track-request-or-appeal. Pursuant to 28 C.F.R. § 16.8(e), your appeal must be postmarked or electronically transmitted within ninety (90) days of the date of this response to your request. If you submit your appeal by mail, both the letter and the envelope should be clearly marked "Freedom of Information Act Appeal." Please reference the FOIPA Request Number listed above in your correspondence so it may be easily identified. If possible, please provide a copy of your original request and this response letter with your appeal.

Note: Utilizing the FBI's dispute resolution services or requesting mediation through OGIS does not toll the ninety (90) day limit to file a timely appeal with OIP.

Sincerely,

Michael G. Seidel
Section Chief
Record/Information Dissemination Section
Information Management Division

Enclosures

*Exhibit 28*

## FBI FOIPA Addendum

As referenced in our letter responding to your Freedom of Information/Privacy Acts (FOIPA) request, the FBI FOIPA Addendum provides information applicable to your request. Part 1 of the Addendum includes standard responses that apply to all requests. Part 2 includes standard responses that apply to requests for records about individuals to the extent your request seeks the listed information. Part 3 includes general information about FBI records, searches, and programs.

**Part 1: The standard responses below apply to all requests:**

(i) 5 U.S.C. § 552(c). Congress excluded three categories of law enforcement and national security records from the requirements of the FOIPA [5 U.S.C. § 552(c)]. FBI responses are limited to those records subject to the requirements of the FOIPA. Additional information about the FBI and the FOIPA can be found on the www.fbi.gov/foia website.

(ii) Intelligence Records. To the extent your request seeks records of intelligence sources, methods, or activities, the FBI can neither confirm nor deny the existence of records responsive to FOIA exemptions (b)(1), (b)(3) and as applicable to requests for records about individuals, PA exemption (j)(2) [5 U.S.C. §§ 552/552a (b)(1), (b)(3), and (j)(2)]. The mere acknowledgment of the existence or nonexistence of such records is itself a classified fact protected by FOIA exemption (b)(1) and/or would reveal intelligence sources, methods, or activities protected by exemption (b)(3) [50 USC § 3024(i)(1)]. This is a standard response and should not be read to indicate that any such records do or do not exist.

**Part 2: The standard responses below apply to all requests for records on individuals:**

(i) Requests for Records about any Individual—Watch Lists. The FBI can neither confirm nor deny the existence of any individual's name on a watch list pursuant to FOIA exemption (b)(7)(E) and PA exemption (j)(2) [5 U.S.C. §§ 552/552a (b)(7)(E), (j)(2)]. This is a standard response and should not be read to indicate that watch list records do or do not exist

(ii) Requests for Records about any Individual—Witness Security Program Records. The FBI can neither confirm nor deny the existence of records about any individual's participant in the Witness Security Program pursuant to FOIA exemption (b)(3) and PA exemption (j)(2) [5 U.S.C. §§ 552/552a (b)(3), 18 U.S.C. 3521, and (j)(2)]. This is a standard response and should not be read to indicate that such records do or do not exist

(iii) Requests for Confidential Informant Records. The FBI can neither confirm nor deny the existence of confidential informant records pursuant to FOIA exemptions (b)(7)(D), (b)(7)(E); and (b)(7)(F) [5 U.S.C.§ § 552 (b)(7)(D), (b)(7)(E) and (b)(7)(F)] and Privacy Act exemption (j)(2) [5 U.S.C.§ 552a (j)(2)]. The mere acknowledgment of the existence or nonexistence of such records would reveal confidential informant identities and information, expose law enforcement techniques, and endanger the life or physical safety of individuals. This is a standard response and should not be read to indicate that such records do or do not exist

**Part 3: General Information:**

(i) Record Searches and Standard Search Policy. The Record/Information Dissemination Section (RIDS) searches for reasonably described records by searching systems, such as the Central Records System (CRS) or locations where responsive records would reasonably be found. The CRS is an extensive system of records consisting of applicant, investigative, intelligence, personnel, administrative, and general files compiled by the FBI per its law enforcement, intelligence, and administrative functions. The CRS spans the entire FBI organization, comprising records of FBI Headquarters, FBI Field Offices, and FBI Legal Attaché Offices (Legats) worldwide; Electronic Surveillance (ELSUR) records are included in the CRS. The standard search policy is a search for main entity records in the CRS. Unless specifically requested, a standard search does not include a search for reference entity records or administrative records of previous FOIPA requests.

    a. Main Entity Records – created for individuals or non-individuals who are the subjects or the focus of an investigation

    b. Reference Entity Records- created for individuals or non-individuals who are mentioned in a case but are not known subjects or the focus of an investigation

(ii) FBI Records. Founded in 1908, the FBI carries out a dual law enforcement and national security mission. As part of this dual mission, the FBI creates and maintains records on various subjects; however, the FBI does not maintain records on every person, subject, or entity

(iii) Foreseeable Harm Standard. As amended in 2016, the Freedom of Information Act provides that a federal agency may withhold responsive records only if: (1) the agency reasonably foresees that disclosure would harm an interest protected by one of the nine exemptions that FOIA enumerates, or (2) disclosure is prohibited by law (5 United States Code, Section 552(a)(8)(A)(i)). The FBI considers this foreseeable harm standard in the processing of its requests.

(iv) Requests for Criminal History Records or Rap Sheets. The Criminal Justice Information Services (CJIS) Division provides Identity History Summary Checks – often referred to as a criminal history record or rap sheet. These criminal history records are not the same as material in an investigative "FBI file." An Identity History Summary Check is a listing of information taken from fingerprint cards and documents submitted to the FBI in connection with arrests, federal employment, naturalization, or military service. For a fee, individuals can request a copy of their Identity History Summary Check. Forms and directions can be accessed at www.fbi.gov/about-us/cjis/identity-history-summary-checks. Additionally, requests can be submitted electronically at www.edo.cjis.gov. For additional information, please contact CJIS directly at (304) 625-5590

## EXPLANATION OF EXEMPTIONS

### SUBSECTIONS OF TITLE 5, UNITED STATES CODE, SECTION 552

(b)(1) (A) specifically authorized under criteria established by an Executive order to be kept secret in the interest of national defense or foreign policy and (B) are in fact properly classified to such Executive order.

(b)(2) related solely to the internal personnel rules and practices of an agency.

(b)(3) specifically exempted from disclosure by statute (other than section 552b of this title), provided that such statute (A) requires that the matters be withheld from the public in such a manner as to leave no discretion on issue, or (B) establishes particular criteria for withholding or refers to particular types of matters to be withheld.

(b)(4) trade secrets and commercial or financial information obtained from a person and privileged or confidential.

(b)(5) inter-agency or intra-agency memorandums or letters which would not be available by law to a party other than an agency in litigation with the agency.

(b)(6) personnel and medical files and similar files the disclosure of which would constitute a clearly unwarranted invasion of personal privacy.

(b)(7) records or information compiled for law enforcement purposes, but only to the extent that the production of such law enforcement records or information ( A ) could reasonably be expected to interfere with enforcement proceedings, ( B ) would deprive a person of a right to a fair trial or an impartial adjudication, ( C ) could reasonably be expected to constitute an unwarranted invasion of personal privacy, ( D ) could reasonably be expected to disclose the identity of confidential source, including a State, local, or foreign agency or authority or any private institution which furnished information on a confidential basis, and, in the case of record or information compiled by a criminal law enforcement authority in the course of a criminal investigation, or by an agency conducting a lawful national security intelligence investigation, information furnished by a confidential source, ( E ) would disclose techniques and procedures for law enforcement investigations or prosecutions, or would disclose guidelines for law enforcement investigations or prosecutions if such disclosure could reasonably be expected to risk circumvention of the law, or ( F ) could reasonably be expected to endanger the life or physical safety of any individual.

(b)(8) contained in or related to examination, operating, or condition reports prepared by or on behalf of, or for the use of an agency responsible for the regulation or supervision of financial institutions, or

(b)(9) geological and geophysical information and data, including maps, concerning wells

### SUBSECTIONS OF TITLE 5, UNITED STATES CODE, SECTION 552a

(d)(5) information compiled in reasonable anticipation of a civil action proceeding,

(j)(2) material reporting investigative efforts pertaining to the enforcement of criminal law including efforts to prevent, control, or reduce crime or apprehend criminals,

(k)(1) information which is currently and properly classified pursuant to an Executive order in the interest of the national defense or foreign policy, for example, information involving intelligence sources or methods;

(k)(2) investigatory material compiled for law enforcement purposes, other than criminal, which did not result in loss of a right, benefit or privilege under Federal programs, or which would identify a source who furnished information pursuant to a promise that his/her identity would be held in confidence,

(k)(3) material maintained in connection with providing protective services to the President of the United States or any other individual pursuant to the authority of Title 18, United States Code, Section 3056;

(k)(4) required by statute to be maintained and used solely as statistical records.

(k)(5) investigatory material compiled solely for the purpose of determining suitability, eligibility, or qualifications for Federal civilian employment or for access to classified information, the disclosure of which would reveal the identity of the person who furnished information pursuant to a promise that his/her identity would be held in confidence,

(k)(6) testing or examination material used to determine individual qualifications for appointment or promotion in Federal Government service the release of which would compromise the testing or examination process,

(k)(7) material used to determine potential for promotion in the armed services, the disclosure of which would reveal the identity of the person who furnished the material pursuant to a promise that his/her identity would be held in confidence

FBI/DOJ

# Exhibit 29.1

Transcript of prosecution saying "weapons" carried by protesters.   Sep 13, page 27, line 25

# Exhibit 29.2

Transcript of officer saying he saw no weapon.   Sep14, page 79, line 24

27

```
1    attention to the barricades in this case, because these
2    barricades, that is a visual sign to individuals like the
3    defendant and those who stood with him that he should not cross
4    that line.
5            On the opposite side of the line, as you can see, are
6    police officers, some who are Capitol Police officers, some who
7    you will learn were members of the Metropolitan Police
8    Department.  And, obviously, those agencies were assisted by
9    other units on that day as well.
10           You will see that the defendants didn't want to, but
11   they were forced to remain behind those bicycle racks.  And
12   that becomes critical when you are talking about crowd control.
13   But you are going to hear that the defendant ignored signs that
14   were given to him.  And so what were those signs?  First, you
15   are going to see that the defendant was clad in yellow working
16   gloves that day.  Some of the signs that were given to him with
17   his hands on those bicycle racks was to stop trying to move the
18   bicycle barricades forward.  Did the defendant listen?  No, he
19   did not.
20           Because not only did he grip one fence, he would move
21   around and use his other hand to then grab the other side of
22   the fence.  When he left from one fence, he then moved to
23   another bicycle rack.  And you will see that even though this
24   is a riot, many of the rioters who were standing behind were
25   armed with weapons that day, throwing things at officers,
```

Exhibit 29.1

79

DIRECT EXAMINATION OF JOHN ERNST

1  trying to still maintain a police line.  Now that our barrier
2  is gone, now myself and the others are trying to still maintain
3  a police line now that our barrier is gone.
4       Q.  And just right at this second that we see here, how
5  many other officers are on the line with you?
6       A.  At this point, it is myself -- myself -- this officer
7  right here is still on the line trying to maintain the line
8  holding the fence there.  This officer right here is also
9  maintaining the line, watching the crowd to see what is going
10 to happen next.
11      Q.  Is it safe to say that you are the only one really in
12 the gap of the fence?
13      A.  Yes.
14      Q.  If we could go back 5 seconds, a little further,
15 please.  Keep going.
16      Pause.
17      What are you doing with your left hand right here?
18      A.  My left hand, my baton was on my left side that day.
19 So once the fencing was gone, I was reaching -- it looks like
20 reaching for my baton to take that out and use it if need be.
21      Q.  Did you take it out?
22      A.  I did not deploy my baton that day.
23      Q.  Why not?
24      A.  Because at the time I felt like I didn't see any
25 individuals with any weapons, anything in their hands that I

Exhibit 29.2

# Exhibit 30

Sentencing transcript and prosecution's 26 uses of variations of the word "assault":

assault           p4, line 18
                            p5, line 5
                            p6, line 4, 5, 6, 10, 13, 15, 16
                            p13 line 9, 10, 14
                            p14, line 10

assaults          p4, line 2
                            p5, line 5, 12, 13, 13
                            p8, line 15
                            p13, line 6

assaulted         p10, line 5
                            p12, line 5
                            p14, line 14, 19
                            p15, line 1
                            p16, line 2

# Exhibit 31

Sentencing transcript for Nathan Hale quote – page 15, line 13

15

```
 1    assaulted any officers, that he was just there that day to wave
 2    the flag.  He continued to, I think, verbally undermine
 3    officers and specifically the female officers that reported to
 4    the scene on that day.  He talked about disregarding the signs
 5    and that there was nothing that was going to stop him from
 6    going to wave the flag on the Capitol grounds on that day.
 7            That was the first submission that he made.  And then
 8    he continued to, I guess, sort of be a cheerleader for his
 9    conduct on January 6 by his campaign for governor of Oregon,
10    where he continued to make videos about what happened on
11    January 6.  He was very prideful and very proud of what he did
12    on January 6, never once expressing remorse.
13            And then furthermore, after this trial, the probation
14    office has had the opportunity to interview Mr. Christensen.
15    And his words to them was that he wished that he had more than
16    one life to give for his country.  So that suggests to this
17    government that he is not remorseful for his conduct.  And in
18    the climate that we are in, we believe that if Mr. Christensen
19    were to be given a light sentence, one, that there is nothing
20    to say he would not behave this way again.  And, second, that
21    we would expect that Mr. Christensen would do everything that
22    he did and more to continue to convey his political beliefs.
23            So, Your Honor, based on the evidence that was
24    submitted at trial and based on the government's submission, we
25    believe that a variance is appropriate in this case of 60
```

Exhibit 31

Exhibit 32

Sentencing transcript – judge did not ask about my stroke symptoms – page 19, line 4

19

```
 1    physical contact with those officers.  We talked a lot about OC
 2    spray at the trial.  I am not going to take your time up with
 3    that today, at all.  But it is fair to say that he was someone
 4    who suffered a stroke, suffered a more major stroke immediately
 5    after January 6.  And then on April 2022, suffered another
 6    stroke.  This is a 65-year-old person.  And I warned
 7    Mr. Christensen that I would insult him in this way, but we are
 8    not talking about a very physically vigorous 65-year-old.  And
 9    I think that is apparent from the videos.
10            It would be the defendant's position that it was a
11    lot of flailing around.  He was trying to get to the Capitol
12    steps.  He admits that, but he was not intending to assault
13    anyone on that day.
14            I will be talking about other cases and how they have
15    been charged.  And we, you know, we start getting down into the
16    details here, but I think the details are important.
17            The worst thing that Mr. Christensen said that day
18    was to one of the officers saying, you are no lady.  It is not
19    vulgar.  He is not particularly angry.  He is not shouting.  He
20    is certainly not leading.  He is not chanting.  You see him on
21    video.  That is -- that is the best thing about this case.
22    There is not a lot of guesswork involved.  You see his
23    demeanor, his conduct.  He seems intent on getting past these
24    officers.  But he is not coordinating with other participants.
25    He is not leading charges.  He is not coordinating.  And that
```

Exhibit 32

# Exhibit 33

FirstTech printout of book royalties.

4/28/25, 9:07 AM      Print Transactions

# First Tech Federal Credit Union

*Transaction History*

SAVE THE KID LLC .
Simple Business Checking *7333

Statement Period: All Dates     Date of Statement: 04/28/2025

**FILTERS**

Keywords    ACH Deposit

## Posted Transactions (31)

| DATE | DESCRIPTION | AMOUNT | BALANCE |
|------|-------------|--------|---------|
| 3/31/2025 12:00:00 AM | ACH Deposit Amazon.com Servi - PAYMENTS ISA*00*NV *09*NV *ZZ*9060027358 *ZZ*NV *250320*085 1*U*004011*0900 | $30.63 | |
| 2/28/2025 12:00:00 AM | ACH Deposit Amazon.com Servi - PAYMENTS ISA*00*NV *09*NV *ZZ*9060027358 *ZZ*NV *250219*145 0*U*004011*0900 | $18.12 | |
| 1/29/2025 12:00:00 AM | ACH Deposit Amazon.com Servi - PAYMENTS ISA*00*NV *09*NV *ZZ*9060027358 *ZZ*NV *250120*100 2*U*004011*0900 | $94.26 | |
| 12/30/2024 12:00:00 AM | ACH Deposit Amazon.com Servi - PAYMENTS ISA*00*NV *09*NV *ZZ*9060027358 *ZZ*NV *241220*081 9*U*004011*0900 | $49.77 | |
| 11/29/2024 12:00:00 AM | ACH Deposit Amazon.com Servi - PAYMENTS ISA*00*NV *09*NV *ZZ*9060027358 *ZZ*NV *241119*160 3*U*004011*0900 | $31.71 | |
| 10/29/2024 12:00:00 AM | ACH Deposit AMAZON.COM, INC. - PAYMENTS FCS0024534469012 | $13.59 | |
| 9/30/2024 12:00:00 AM | ACH Deposit AMAZON.COM, INC. - PAYMENTS FCS0024031169942 | $3.96 | |
| 8/29/2024 12:00:00 AM | ACH Deposit AMAZON.COM, INC. - PAYMENTS FCS0023450069442 | $62.34 | |
| 7/29/2024 12:00:00 AM | ACH Deposit AMAZON.COM, INC. - PAYMENTS FCS0022997921422 | $13.59 | |
| 7/1/2024 12:00:00 AM | ACH Deposit AMAZON.COM, INC. - PAYMENTS FCS0022469002452 | $23.65 | |
| 5/29/2024 12:00:00 AM | ACH Deposit AMAZON.COM, INC. - PAYMENTS FCS0021056691482 | $70.52 | |

| DATE | DESCRIPTION | AMOUNT | BALANCE |
|------|-------------|--------|---------|
| 4/29/2024 12:00:00 AM | ACH Deposit AMAZON.COM, INC. - PAYMENTS FCS0021478385512 | $192.65 | |
| 3/29/2024 12:00:00 AM | ACH Deposit AMAZON.COM, INC. - PAYMENTS FCS0020897726862 | $457.69 | |
| 2/29/2024 12:00:00 AM | ACH Deposit AMAZON.COM, INC. - PAYMENTS FCS0020425418372 | $53.28 | |
| 1/29/2024 12:00:00 AM | ACH Deposit AMAZON.COM, INC. - PAYMENTS FCS0019928884102 | $489.21 | |
| 12/28/2023 12:00:00 AM | ACH Deposit AMAZON.COM, INC. - PAYMENTS FCS0019553112302 | $209.67 | |
| 11/29/2023 12:00:00 AM | ACH Deposit AMAZON.COM, INC. - PAYMENTS FCS0019076572 | $27.30 | |
| 10/30/2023 12:00:00 AM | ACH Deposit AMAZON.COM, INC. - PAYMENTS FCS0018564925342 | $55.73 | |
| 9/29/2023 12:00:00 AM | ACH Deposit AMAZON.COM, INC. - PAYMENTS FCS0018097869362 | $95.13 | |
| 8/28/2023 12:00:00 AM | ACH Deposit AMAZON.COM, INC. - PAYMENTS FCS0017620201072 | $45.50 | |
| 7/31/2023 12:00:00 AM | ACH Deposit AMAZON.COM, INC. - PAYMENTS FCS0017152349002 | $61.48 | |
| 6/29/2023 12:00:00 AM | ACH Deposit AMAZON.COM, INC. - PAYMENTS FCS0016717523032 | $83.64 | |
| 5/30/2023 12:00:00 AM | ACH Deposit AMAZON.COM, INC. - PAYMENTS FCS0016255009052 | $64.29 | |
| 3/29/2023 12:00:00 AM | ACH Deposit AMAZON.COM, INC. - PAYMENTS FCS0015484533372 | $70.20 | |
| 12/29/2022 12:00:00 AM | ACH Deposit AMAZON.COM, INC. - PAYMENTS FCS0014228837132 | $6.45 | |
| 10/31/2022 12:00:00 AM | ACH Deposit AMAZON.COM, INC. - PAYMENTS FCS0013423186002 | $6.43 | |
| 7/29/2022 12:00:00 AM | ACH Deposit AMAZON.COM, INC. - PAYMENTS FCS0012303721142 | $3.45 | |
| 6/29/2022 12:00:00 AM | ACH Deposit AMAZON.COM, INC. - PAYMENTS FCS0011916509152 | $2.05 | |
| 5/31/2022 12:00:00 AM | ACH Deposit AMAZON.CO2250801 EDI - EDI PYMNTS FCS0015738126362 | $7.09 | |
| 4/29/2022 12:00:00 AM | ACH Deposit AMAZON.COM INC. - PAYMENTS FCS0011231441682 | $3.50 | |
| 3/28/2022 12:00:00 AM | ACH Deposit AMAZON.CO2284738 EDI - EDI PYMNTS FCS0010899918662 | $30.93 | |


Exhibit 33

# Exhibit 34

Sentencing transcript – must never happen again – page 31, line 25

1     citizens that in that situation, they not continue to confront,

2     and in my opinion, fight with the police there. And the law

3     requires that I sentence you in this case under the findings of

4     the jury here and with which I agree that you are, in fact,

5     guilty of these offenses.

6           I am a guideline judge. I will give you the minimum

7     under the guidelines. I do follow the guidelines. I do not

8     think there is a basis for either the upward departure that the

9     government is asking for or a downward departure. I think the

10    guidelines are appropriate in a case like this. I follow the

11    guidelines. I think because of your age, the guidelines are

12    tough. But the guidelines are set for a reason that we think

13    that that is the way to be fair and even handed across the

14    board with all defendants. I will follow the guidelines in

15    this case. I think that it makes it difficult in all of these

16    cases like yours where you have led a good life.

17          You have served our country in times of need and in

18    the military. You have never been in trouble, never been

19    arrested or convicted of anything, have a successful life until

20    this. And you don't have to change your views of life and say

21    to me that you now have different political views. Your

22    political views can be whatever you want them to be. You don't

23    have to renounce whatever you thought that day.

24          But what you ended up doing that day is wrong under

25    the law. And the law has to be enforced by this Court to deter

Exhibit 34

# Exhibit 35

My before and after picture of body weight.

**Before**
June 29, 2023

**After**
January 21, 2025





# Exhibit 36

Reed and Myra in the Forrest City Low Visitation Room



# Exhibit 37

Booklet of the Hillsboro farm property



PEACEFUL HILLSBORO FARM

3020 SW 325th Ave., Hillsboro

Exhibit 37

# Exhibit 38

Legal fee summary spreadsheet

Sheet1

| Payee | Amount | Printed Copy | Note |
|---|---|---|---|
| McKean Smith | $173.58 | x | resend |
| McKean Smith – appeal | $506.15 | x | |
| McKean Smith | | | Non-J6 |
| McKean Smith | $173.58 | x | |
| McKean Smith – appeal | $8,545.22 | x | |
| McKean Smith | | | Non-J6 |
| McKean Smith | $172.00 | x | |
| McKean Smith | $1,867.19 | x | |
| McKean Smith | | | Non-J6 |
| McKean Smith | $860.00 | x | |
| McKean Smith – appeal | $1,064.24 | x | |
| McKean Smith | | | Non-J6 |
| McKean Smith – appeal | $0.00 | | |
| McKean Smith | | | Non-J6 |
| McKean Smith – appeal | $1,048.87 | x | |
| McKean Smith | | | Non-J6 |
| McKean Smith – appeal | $953.47 | x | |
| McKean Smith | | | Non-J6 |
| McKean Smith – appeal | $1,740.52 | x | |
| McKean Smith | | | Non-J6 |
| McKean Smith | $120.88 | x | |
| McKean Smith – appeal | $5,179.60 | x | |
| McKean Smith | | | Non-J6 |
| McKean Smith | $1.09 | x | interest |
| McKean Smith – appeal | $17,533.99 | x | |
| McKean Smith | | | Non-J6 |
| McKean Smith | $1.29 | x | interest |
| McKean Smith – appeal | $2,735.86 | x | |
| McKean Smith | | | Non-J6 |
| McKean Smith | $118.50 | x | |
| McKean Smith | | | Non-J6 |
| McKean Smith | $849.50 | x | |
| McKean Smith | | | Non-J6 |
| McKean Smith | $5,856.20 | x | |
| McKean Smith | | | Non-J6 |
| McKean Smith | $27,179.50 | x | |
| McKean Smith | $6,032.50 | | MS list |
| McKean Smith | $17,912.16 | | MS list |
| McKean Smith | | | Non-J6 |
| McKean Smith | $10,447.32 | x | |
| McKean Smith | | | Non-J6 |
| McKean Smith | $3,909.54 | x | |
| McKean Smith | | | Non-J6 |
| McKean Smith | $63,422.50 | x | |
| McKean Smith | | | Non-J6 |
| McKean Smith | $25,537.00 | x | |
| McKean Smith | $14,164.40 | x | |
| McKean Smith | $1,621.00 | x | |
| McKean Smith | $2,455.00 | x | |
| McKean Smith | $1,849.00 | x | |
| McKean Smith | $18,056.00 | x | |
| McKean Smith | | | Non-J6 |
| McKean Smith | $7,745.17 | x | |
| McKean Smith | | | Non-J6 |
| McKean Smith | $8,450.00 | x | |
| McKean Smith | | | Non-J6 |
| McKean Smith | $1,936.50 | x | |
| McKean Smith | | | Non-J6 |
| McKean Smith | $2,755.00 | x | |
| McKean Smith | | | Non-J6 |
| McKean Smith | $2,020.00 | x | |
| McKean Smith | | | Non-J6 |
| McKean Smith | $1,622.50 | x | |
| McKean Smith | | | Non-J6 |
| McKean Smith | $15,872.50 | x | |
| McKean Smith | $3,540.50 | x | |
| McKean Smith | $1,237.00 | x | |
| McKean Smith | $3,375.00 | x | |
| McKean Smith | $1,008.00 | x | |
| McKean Smith | $5,259.00 | x | |
| McKean Smith | $8,718.80 | x | |
| McKean Smith | $6,164.50 | x | |
| McKean Smith | $16,691.55 | x | |
| ScrofanoLaw PC | $12,000.00 | x | |
| Troy Nixon LLC | $4,153.50 | x | |
| Troy Nixon LLC | $16,871.90 | x | |
| Troy Nixon LLC | $2,499.50 | x | |
| Troy Nixon LLC | $2,200.50 | x | |
| **Total:** | **$365,812.07** | | |

Exhibit 3B